In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-3898

KENNETH PUGH and CHAD BOYLAN,

*Plaintiffs-Appellants,*


*v.*


TRIBUNE COMPANY, DENNIS J. FITZSIMONS,
JOHN W. MADIGAN, et al.,

*Defendants-Appellees.*


No. 06-3909

CITY OF PHILADELPHIA BOARD OF PENSIONS AND
RETIREMENT, individually and on behalf of all
others similarly situated,

*Plaintiff-Appellant,*

*v.*


TRIBUNE COMPANY, DENNIS J. FITZSIMONS,
DONALD C. GRENESKO, et al.,

*Defendants-Appellees.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 05 C 2602 & 05 C 2927—**William T. Hart,** *Judge.*

———————

ARGUED JANUARY 23, 2008—DECIDED APRIL 2, 2008

———————

Before MANION, ROVNER, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge*.  In this consolidated appeal, we review two cases arising out of a fraud that occurred at a New York subsidiary of defendant Tribune Company. Certain employees at the subsidiary falsely boosted the circulation figures of two newspapers, *Newsday* and the Spanish-language *Hoy*, increasing the amount that they were able to charge advertisers and, in turn, inflating revenues. Tribune, along with an independent auditor, ultimately discovered and publicly disclosed the fraud, which resulted in a $90 million charge against earnings. Our first case is a securities class action brought by purchasers of Tribune common stock against Tribune, four of its executive officers, and five employees of *Newsday* and *Hoy*. Our second case is an ERISA class action brought by participants in Tribune's pension plans that held shares in an employee stock ownership plan (ESOP) against the alleged plan fiduciaries. The district court (Judge William T. Hart) dismissed both cases with prejudice. They are now before us on the plaintiffs' appeals.

Because the same events underlie the allegations in both complaints, some common facts can be discussed up front. Tribune is a media and entertainment company engaging in newspaper publishing (*e.g.*, the *Chicago Tribune*, the *Los Angeles Times*), television and radio broadcasting (*e.g.*, Superstation WGN), and other entertainment ventures (*e.g.*, the Chicago Cubs—at least for the time being). Tribune's publishing segment purportedly generates more than 70 percent of its total revenues, which exceeded $5 billion annually during the years immediately prior to these lawsuits. At that time, *Newsday* operated as a New York subsidiary of Tribune, and *Hoy* was a division of *Newsday*. These are just 2 of the at least 11 daily newspapers that fall

under Tribune's umbrella. The Audit Bureau of Circulations (ABC), an independent nonprofit monitoring organization, conducts annual audits of each newspaper's paid circulation figures. The results of its audits are used to determine how much advertisers pay for their ads to appear in a newspaper.

At least as early as 2001, *Newsday* and *Hoy* overstated their circulation figures. Schemes such as phony hawking programs, false affidavits that understated returns and overstated net sales, and directions to subordinates to pay distributors for bogus deliveries of newspapers were employed. In addition, many copies of the two papers were merely dumped, or delivered to people who had not paid for them. The overstated circulation numbers resulted in *Newsday* and *Hoy* charging higher advertising rates than would have been charged otherwise. The true circulation of *Newsday* and *Hoy* was roughly 80 percent and 50 percent, respectively, of what was reported.

Starting in February 2004, advertisers filed lawsuits alleging that *Newsday* and *Hoy* had overstated circulation. On February 11, 2004, Tribune issued a press release stating that Raymond Jansen (*Newsday*'s publisher from 1994 to 2004 and a named defendant in our securities case) had issued a statement that the lawsuit filed the previous day against *Newsday* and *Hoy* was "completely without merit," the allegations contained in it were "false," and the source of the allegations was no more than "a disgruntled former employee." Notwithstanding *Newsday*'s denial, Tribune, together with ABC, started its own internal investigation of the paid circulation figures. Shortly after the advertisers' lawsuit was filed, the SEC, the U.S. Attorney's Office for the Eastern District of New York, the U.S. Attorney's Office for the District of Connecticut, and the

Connecticut Attorney General's Office began investigations.[1]

In June 2004, Tribune's investigation revealed that the circulation figures for *Newsday* and *Hoy* had in fact been inflated. On June 17, 2004, *Newsday* issued a press release stating that the September 2003 circulation figures for *Newsday* and *Hoy* were overstated and that both publications "expect to make significantly smaller adjustments to their March 2004 circulation figures." That day, Tribune's stock closed at $47.27 per share, up from $46.78 the day before.[2] On June 18, it closed at $46.81.

---

[1] Criminal charges were later brought against several *Newsday* and *Hoy* employees. A May 30, 2006, press release from the U.S. Attorney's Office for the Eastern District of New York reported guilty pleas by nine former *Newsday* and *Hoy* employees, including four of the five *Newsday* and *Hoy* employees named as defendants in our securities case (Brennan, Czark, Garcia, and Sito). U.S. Department of Justice, Nine Former Employees and Contractors of Newsday and Hoy Plead Guilty to Scheme to Defraud Newspaper Advertisers, www.usdoj.gov/usao/nye/pr/2006/2006may30.html. The press release also said that the SEC settled its enforcement action against Tribune the same day. A December 18, 2007, press release reported that *Newsday* and *Hoy* agreed to forfeit $15 million to the United States pursuant to an agreement that resolves its criminal investigation. U.S. Department of Justice, Newsday and Hoy Agree to Resolve Criminal Inquiry into Scheme to Defraud Newspaper Advertisers, www.usdoj.gov/usao/nye/pr/2007/2007dec18b.html.

[2] We may take judicial notice of documents in the public record, including publicly reported stock prices, without converting a motion to dismiss into a motion for summary

(continued...)

In a July 14, 2004, press release, Tribune stated that an investigation revealed that further adjustments would be made to the September 2003 and March 2004 circulation figures for *Newsday* and *Hoy* and that there were also misstatements for 2001 and 2002. Tribune also noted that its second quarter results included a $35 million charge related to an anticipated settlement of the advertisers' lawsuits. Dennis FitzSimons (Tribune's chairman and CEO since 2003 and a named defendant in both of our cases) is quoted as saying that "we moved aggressively to address circulation misstatements at Newsday and Hoy[.]" On July 15, Tribune's stock closed at $42.00 per share, down from $43.12 the day before.

On July 30, 2004, Tribune filed its second quarter 10-Q report with the SEC. There, Tribune reiterated the results mentioned in the July 14 press release, including the $35 million charge. Tribune also stated that it would continue to defend the lawsuits and evaluate the adequacy of the $35 million reserve. Tribune said that *Newsday* and *Hoy* had been censured by ABC, that SEC and criminal investigations were underway, and that Tribune was cooperating with the investigations.

On September 10, 2004, Tribune issued a press release that disclosed the true circulation numbers. It also stated that the cost to settle the advertisers' lawsuits would be increased by $45 to $60 million, which would be included in the third quarter results. The same day, ABC announced that it expected to complete its audit of the circulation issues in a month. It noted that the audit had taken longer

---

[2] (...continued)
judgment. *See*, *e.g.*, *Radaszewski v. Maram*, 383 F.3d 599, 600 (7th Cir. 2004).

than expected because of the "depth and complexity of circulation irregularities identified and quantified by the audit process[.]" On September 13, Tribune stock closed at $39.72 per share. On November 30, however, Tribune's stock closed at $43.37—$0.25 higher than before the July 15 announcements.

After similar complaints against Tribune and its employees based on these events were filed, the district court consolidated the various cases. Pursuant to the Private Securities Litigation Reform Act of 1995 (PSLRA), the court appointed a lead plaintiff and lead counsel in the securities case. At that point, an amended consolidated class action complaint was filed. Subsequently, the lead plaintiff filed a second lawsuit, adding two defendants who had not been named in the first complaint as well as several allegations. The district court granted a motion to consolidate the two suits and for leave to file a second amended complaint. The proposed plaintiff class consists of people who purchased Tribune common stock between January 24, 2002, and September 10, 2004.

The PSLRA does not apply to the ERISA case, in which a consolidated amended ERISA complaint was filed. The proposed plaintiff class there consists of participants in Tribune's sponsored retirement plans whose individual accounts held shares in the ESOP at any time from December 31, 2002, to October 28, 2005 (the date the complaint was filed).

In a comprehensive memorandum opinion and order, the district court dismissed both complaints with prejudice. *Hill v. The Tribune Co.*, Nos. 05 C 2602, 05 C 2927, 06 C 0741, 2006 WL 2861016 (N.D. Ill. Sept. 29, 2006). As always, we review a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) *de novo*, taking all factual allegations as

true and drawing all reasonable inferences in favor of the plaintiffs. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 594 (7th Cir. 2006), *rev'd on other grounds*, 127 S. Ct. 2499 (2007) (*Makor I*). We will address the securities case and the ERISA case separately, in that order.

The securities complaint asserts two claims. The first claim arises under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. It is brought against Tribune, four of its executive officers (the Tribune individual defendants),[3] and certain employees of *Newsday* and *Hoy* (the *Newsday-Hoy* individual defendants).[4] In a typical § 10(b) private action, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

---

[3]  For the sake of consistency, we will use the district court's appellations for groups of defendants. The Tribune individual defendants are FitzSimons; Donald Grenesko, Tribune's senior vice-president of Finance and Administration; Jack Fuller, president of Tribune Publishing Company; and John Madigan, chairman and CEO of Tribune immediately before FitzSimons.

[4]  The *Newsday-Hoy* individual defendants are Jansen; Robert Brennan, *Newsday*'s vice-president for Circulation until June 2004; Richard Czark, *Hoy*'s former National Circulation manager; Robert Garcia, a former sales and distribution manager of *Hoy*; and Louis Sito. Sito had multiple titles: he was *Newsday*'s vice-president for Circulation before Brennan, *Hoy*'s president, publisher, and chief executive until his July 2004 retirement, and Tribune's vice-president for Hispanic Media, again until his retirement.

causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 768 (2008).

The second securities claim arises under § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). It is brought against all of the individual defendants and contends that the Tribune individual defendants are "controlling persons" of the *Newsday-Hoy* individual defendants. Section 20(a) states that "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person[.]" *Id.* Thus, to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b-5. *See Southland Securities v. INSpire Ins. Solutions*, 365 F.3d 353, 383-84 (5th Cir. 2004).

The PSLRA provides that the complaint in a securities fraud action must "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The "required state of mind" in a § 10(b) case is scienter, which means "knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). The Supreme Court has directed us to dismiss the complaint unless "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007). Accordingly, we must weigh the strength of the plaintiffs' inferences in comparison to plausible nonculpable explanations for the defendants' conduct. *Id.*

We have rejected the "group pleading doctrine," a judicial presumption that statements in group-published documents are attributable to officers who have daily involvement in company operations; thus, the plaintiffs must create a strong inference of scienter with respect to each individual defendant. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (*Makor II*).

The plaintiffs first allege primary liability on the part of the Tribune individual defendants. The Tribune individual defendants argue that, viewed holistically, the allegations against them do not come close to giving rise to a strong inference of scienter when viewed against opposing inferences. The complaint, they say, makes clear that the circulation fraud was purposely designed to deceive ABC and Tribune, as well as *Newsday* and *Hoy* advertisers. After the advertisers' lawsuits were filed, Tribune itself launched an internal investigation, which ultimately revealed that circulation figures had been misstated. As more information became available, the Tribune individual defendants publicly disclosed it. The company also disclosed that other investigations were underway and that certain employees involved in the wrongdoing had been terminated. The Tribune individual defendants argue that these facts, at most, support an inference of internal mismanagement, not recklessness or knowledge.

Against these arguments, the plaintiffs offer an assortment of allegations that purportedly lead to an inference that the Tribune individual defendants were recklessly indifferent to the quality of their SEC filings and press releases. For instance, they state that verifying the accuracy of their newspaper sales would have been "a relatively easy task." Therefore, the Tribune individual defendants "knew or were reckless in not knowing that the sales

revenues received from vendors did not support the circulation figures being reported to [ABC]." Not only is this allegation wholly conclusory, but it has also been expressly criticized. In *Higginbotham*, the plaintiffs similarly sought to draw an inference of scienter from the fact that the individual defendants had access to the subsidiary's allegedly fraudulent financial information. We dismissed this argument, stating that "there is a big difference between knowing about the reports from [a subsidiary] and knowing that the reports are false. The complaint documents the former but not the latter." *Higginbotham*, 495 F.3d at 758. The same rationale applies to our case.

Moreover, the allegations in the complaint support the defendants' contention that the mismatch between circulation figures and revenues may not have been so "obvious." Specifically, the complaint states that ABC has elaborate rules about which newspaper purchases can count toward reported circulation figures. For example, ABC includes in paid circulation "bulk" sales (in which a bulk buyer buys newspapers and gives them away to their customers for free) as long as the charge to the bulk buyer per copy is at least 25 percent of the single copy price. And "sampling" programs (in which newspapers are delivered for free for a period of time) may or may not count toward circulation figures, depending on whether an outside sponsor paid at least 25 percent of the single copy price. Thus, the plaintiffs do not gain any ground with this argument.

The plaintiffs also contend that the Tribune individual defendants intentionally or recklessly created weak circulation controls. But rather than stating allegations about the existing or missing controls, the plaintiffs argue that the controls *must* have been weak *because* a fraud actually occurred. This "fraud by hindsight" argument was

also rejected in *Higginbotham*, where we explained that "by definition, *all* frauds demonstrate the 'inadequacy' of existing controls, just as all bank robberies demonstrate the failure of bank security and all burglaries demonstrate the failure of locks and alarm systems." *Id.* at 760.

In their only attempt to allege a specific control deficiency, the plaintiffs point out that, unlike other publishers, Tribune had not required that its circulation figures be certified before they were submitted to ABC. This allegation seizes upon Tribune's disclosure, at the end of its internal investigation, that in the future it would require certain executives to certify the accuracy of their newspaper's circulation figures. Once again, we refer to *Higginbotham*, where we said that drawing an inference from such facts does not comport with Federal Rule of Evidence 407, which provides that subsequent remedial measures may not be used as evidence of liability. Besides, adding a certification requirement does not show that Tribune's existing controls were insufficient, much less that any individual defendant knew of or was recklessly indifferent to an actual, ongoing fraud.

The plaintiffs also claim that stock sales, exercise of options, and receipt of bonuses by the Tribune individual defendants create a strong inference of scienter. Allegedly, the defendants were motivated to allow "lax" internal controls to inflate revenues, which would allow them to receive bonuses and maximize returns from the exercise of options and sales of Tribune stock. The plaintiffs recognize that, because executives sell stock all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter. *See*, *e.g.*, *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007). But they fail to allege any facts that would allow an assessment

of whether the trading during the class period was unusual or suspicious. Instead, the complaint merely sets forth the aggregate amount of shares sold during the class period and the value of those shares. In *Higginbotham*, we stated that the failure to provide any context showing that the applicable time period was unusual undercuts a "strong" demonstration of scienter. 495 F.3d at 759. Furthermore, the complaint does not allege that, after exercising their stock options, the Tribune individual defendants then turned around and sold those shares, as opposed to retaining them. *Tellabs* instructs us to consider all potential inferences, and the fact that the defendants are not alleged to have sold the stock at the inflated prices meant that they stood to lose a lot of money if the value of Tribune's stock fell.

The plaintiffs finally contend that, whatever the Tribune individual defendants knew prior to February 2004, the lawsuits filed by *Newsday* and *Hoy* advertisers that month demonstrate actual knowledge of the fraud. This argument completely misses the boat. After the lawsuits were filed, the defendants had actual knowledge of *accusations* of fraud, not fraud itself. In February, they promptly commenced an investigation to discover whether the allegations were true. As the investigation continued and more information became available, the defendants disclosed it to the public, issuing press releases in June, July, and September. This is exactly what they should have done, and they did it within a reasonable time, especially considering that the perpetrators allegedly took pains to hide the fraud from both Tribune and ABC. As we explained in *Higginbotham*, "[t]aking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled to investigate for a reasonable time, until

they have a full story to reveal." *Id.* at 761. For all these reasons, the complaint as a whole does not establish a strong inference of scienter as to the Tribune individual defendants.

The plaintiffs also allege primary liability on the part of the *Newsday-Hoy* individual defendants. In response to the plaintiffs' allegations, the *Newsday-Hoy* individual defendants argue that they cannot be held liable for securities fraud because they were not alleged to have participated in the preparation of any of the challenged statements. Moreover, the section of the complaint entitled "Scienter" contains no express allegation regarding any of the *Newsday-Hoy* individual defendants. Here, as in the district court, the plaintiffs do not adequately respond to these arguments as they pertain to Brennan, Czark, and Garcia.

As for Jansen and Sito, the plaintiffs contend that they knowingly signed false circulation audits for *Newsday* and *Hoy* that were submitted to ABC and that these submissions were public statements upon which fraud can be based. For the moment, we will ignore the fact that those statements were made to a third-party auditor and not to Tribune investors. A problem still remains that the PSLRA requires that each statement alleged to be misleading be specified in the complaint. *See* 15 U.S.C. § 78u-4(b)(1). Here, the only misleading statements identified are press releases and SEC filings, not submissions to ABC. The defendants raised this point prior to the district court's judgment, but the plaintiffs' second amended complaint failed to make any changes in this regard.

In any event, the allegations against Jansen are insufficient to establish liability. While Jansen is quoted in an allegedly misleading public statement (the February 11,

2004, press release, denying the validity of the advertisers' lawsuit), the complaint does not allege any facts showing that he was aware of or recklessly disregarded the improper circulation practices at *Newsday* and *Hoy* at the time (unlike the other *Newsday-Hoy* individual defendants, Jansen did not subsequently plead guilty to fraud). Thus, the plaintiffs fail to plead a strong inference of scienter as to Jansen.

Accordingly, the plaintiffs focus on Sito. They emphasize that he can still be found liable because he participated in (and was the "mastermind" of) the scheme to defraud the advertisers. Their theory seems to be that it was "foreseeable" that this scheme would result in improper revenue which, in turn, would be reflected in Tribune's published financial statements. Although absent from the complaint, the plaintiffs now point to Sito's guilty plea—wherein he reportedly admitted to directing *Newsday* and *Hoy* employees to falsely inflate paid circulation data—to prove his state of mind. However, even assuming the guilty plea establishes a strong inference of scienter, the plaintiffs' allegations of so-called "scheme liability" are insufficient under the Supreme Court's recent decision in *Stoneridge*.

In *Stoneridge*, the plaintiffs alleged that business partners of Charter Communications, Inc. violated § 10(b) by engaging in sham transactions with Charter, knowing or recklessly disregarding Charter's intention to report the inflated revenue from those transactions in its public financial statements. While the business partners deliberately engaged in the underlying fraud reflected in Charter's published revenue figures, they had no role in preparing or disseminating Charter's financial statements containing those figures, and the public had no knowledge of their deceptive acts during the relevant times. The plaintiffs

argued, however, that the public disclosure of the false statements "was a natural and expected consequence of [the business partners'] deceptive acts" and therefore sufficient to impose "scheme liability." *Stoneridge*, 128 S. Ct. at 770.

In its decision, the Court rejected the plaintiffs' theory as insufficient to satisfy the reliance requirement of § 10(b):

> In effect petitioner contends that in an efficient market investors rely not only upon the public statements relating to a security but also upon the transactions those statements reflect. Were this concept of reliance to be adopted, the implied cause of action would reach the whole marketplace in which the issuing company does business; and there is no authority for this rule.

*Id.* The Court also discussed the related requirement that actionable conduct be "in connection with the purchase or sale of any security." *See id.* (quoting 15 U.S.C. § 78j(b)). It noted that "the emphasis on a purchase or sale of securities does provide some insight into the deceptive acts that concerned the enacting Congress," and cautioned that "[§ 10(b)] does not reach all commercial transactions that are fraudulent and affect the price of a security in some attenuated way." *Id.* at 770-71. The Court concluded that the plaintiffs could not show reliance upon any of the business partners' actions "except in an indirect chain that we find too remote for liability." *Id.* at 769.

Like the defendants in *Stoneridge*, Sito participated in a fraudulent scheme but had no role in preparing or disseminating Tribune's financial statements or press releases. Furthermore, as we stated earlier, there is no allegation that Tribune investors were ever informed of Sito's false

certifications to ABC. Sito may have foreseen (or even intended) that the advertising scheme would result in improper revenue for *Newsday* and *Hoy*, which would eventually be reflected in Tribune's revenues and finally published in its financial statements. But *Stoneridge* indicates that an indirect chain to the contents of false public statements is too remote to establish primary liability. Without allegations establishing the requisite proximate relation between the *Newsday* and *Hoy* advertiser fraud and the Tribune investors' harm, we cannot uphold the complaint. Thus, the plaintiffs do not satisfy the pleading requirements as to any of the *Newsday-Hoy* individual defendants.

The plaintiffs finally allege primary liability on the part of Tribune itself. A corporation may be held liable for statements by employees who have apparent authority to make them. *See, e.g.*, *Am. Soc'y. of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 568 (1982). Accordingly, the corporate scienter inquiry must focus on "the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Makor II*, 513 F.3d at 708 (internal citation omitted). As we previously discussed, the complaint fails to plead facts sufficient to support a strong inference of scienter on the part of any of the Tribune individual defendants. So, Tribune's scienter cannot be based on their state of mind. Instead, the plaintiffs argue that Sito's scienter can be imputed to Tribune under the principles of *respondeat*

*superior.*[5]

Even if we assume *arguendo* that the plaintiffs had established Sito's primary liability, there are still two major problems with this argument. First, it is based on the incorrect premise that Sito was a "senior-level" officer of Tribune. The plaintiffs contend that Sito was assigned (among others) the title of "Vice President for Hispanic media at Tribune," but Tribune's SEC filings show that Sito was not an executive officer of Tribune. More importantly, the only fraudulent conduct described in the complaint was not undertaken in his Tribune capacity; the allegations state that (1) Sito was "Publisher" of *Hoy* and (2) "Publishers are required to certify their paid circulation figures to ABC every six months." This is damaging to the plaintiffs because misconduct of employees at a corporate subsidiary is not normally attributed to its corporate parent, absent grounds for piercing the corporate veil. *See, e.g., United States v. Bestfoods*, 524 U.S. 51, 63-64 (1998); *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir. 1998).

Second, and relatedly, the allegations do not show that Sito knowingly overstated circulation figures intending to benefit Tribune. Rather, the complaint demonstrates that the objective of Sito and the other perpetrators in falsely boosting the circulation figures of the two newspapers was to increase the amount that they were able to charge advertisers of *Newsday* and *Hoy*. After this came to light, Tribune was exposed to significant damage claims by its advertisers and regulators. Indeed, Sito and the other

---

[5]   While "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud," *id.* at 710, the plaintiffs do not make that argument here.

perpetrators allegedly took pains to conceal the scheme from Tribune, and the *Newsday* and *Hoy* employees running the scheme are alleged to have bilked the newspapers to pay off the vendors and hawkers with whom they colluded. Sito may have known that, as a result of the scheme, Tribune would misrepresent its assets to investors, but this is not enough; "deliberate wrongs by an employee are not imputed to his employer unless they are not only within the scope of his employment but in attempted furtherance of the employer's goals." *Makor II*, 513 F.3d at 708.

In sum, the plaintiffs fail to establish the primary liability of any individual defendant, and the alleged misconduct is not imputable to Tribune by the doctrine of *respondeat superior*. Accordingly, the plaintiffs' § 10(b) and Rule 10b-5 claim was correctly dismissed in its entirety. And, because the plaintiffs have not adequately alleged the direct liability of any defendant, their § 20(a) claim was also correctly dismissed.

Finally, we review the district court's decision to deny leave to amend for an abuse of discretion. *See, e.g., King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 819 (7th Cir. 2007). The plaintiffs propose to amend their complaint to plead the circulation audit certifications submitted to ABC as actionable statements. As we stated earlier, the defendants pointed out this deficiency before the plaintiffs filed their second amended complaint, but they chose not to remedy it. Courts have rejected the argument that the plaintiffs now make—namely, that they were entitled to wait and see what the district court said before making any changes to the complaint—because it would impose unnecessary costs and inefficiencies on both the courts and party opponents. *See, e.g., ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 57 (1st Cir. 2008) ("The plaintiffs do not get leisurely repeated

bites at the apple, forcing a district judge to decide whether each successive complaint was adequate under the PSLRA."). Moreover, our discussion took this and other "curable" defects into consideration and found that they would not change our ruling; thus, the proposed amendment would be futile.

Our second case concerns investments in Tribune stock by two ERISA benefit plans that are offered to certain Tribune employees. Both are defined contribution plans that assign each participant a personal account, within which the participant may direct his contributions among 10 different funds. Nine of the funds are third-party, publicly traded mutual funds. The other fund—which both plans *required* be available to participants—is the company stock fund, an ESOP investing almost entirely in Tribune common stock. The proposed plaintiff class consists of participants in the two plans whose individual accounts held shares in the ESOP at any time from December 2002 to the date the complaint was filed.

The defendants are Tribune's Employee Benefits Committee (the EBC), 11 current or former members of the EBC (the Committee defendants), 13 members of Tribune's board of directors (the board defendants), and Tribune itself. The EBC is a named fiduciary of each plan and is empowered to administer it. The board is a named fiduciary of one of the two plans; under both plans, however, the board's only assigned duty is to appoint members of the EBC. Tribune is alleged to be a *de facto* fiduciary based on its sponsorship of the plans.

In this case, the plaintiffs do not allege fraud, only breaches of fiduciary duties and ERISA violations. As such, we apply the more lenient pleading standard of Federal Rule of Civil Procedure 8(a)(2), which requires only "a

short and plain statement of the claim showing that the pleader is entitled to relief[.]" However, surviving a Rule 12(b)(6) motion "requires more than labels and conclusions . . . . Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). In addition, a plaintiff can plead himself out of court by alleging facts that show there is no viable claim. *McCready v. eBay, Inc.*, 453 F.3d 882, 888 (7th Cir. 2006).

The complaint alleges three somewhat overlapping claims. The first contends that the defendants violated § 404 of ERISA, 29 U.S.C. § 1104, by failing to prudently and loyally manage assets held by the plans. The second alleges that the defendants violated §§ 404 and 405 of ERISA, 29 U.S.C. §§ 1104, 1105, by failing to provide complete and accurate information to the participants in the plans. The third also alleges violations of §§ 404 and 405 of ERISA and asserts that Tribune and its board failed to properly appoint, monitor, and inform the EBC.

Section 404 of ERISA imposes a "prudent man" standard of care on plan fiduciaries. They discharge their obligations to plan participants by acting "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]" 29 U.S.C. § 1104(a)(1)(B). Section 404 also imposes a duty to diversify investments, *id.* § 1104(a)(1)(C), but the defendants were exempt from this obligation because both plans required that an available investment option be a fund consisting primarily of Tribune stock. *See id.* § 1104(a)(2). However, there are some situations in which the duty of prudence could require diversification of an ESOP's

holdings. *Summers v. State St. Bank & Trust Co.*, 453 F.3d 404, 410 (7th Cir. 2006).

The thrust of the plaintiffs' allegations is that the defendants breached their fiduciary duties by continuing to offer and maintain Tribune stock in the plans at a time when it was imprudent to do so. They do not contend that the defendants actually knew about the underlying circulation fraud being perpetrated by *Newsday* and *Hoy* employees; on the contrary, this would have been tantamount to a claim of fraud against the defendants themselves, subjecting the complaint to the stricter pleading standards of Rule 9(b). Instead, the plaintiffs argue that the defendants had a duty to investigate and uncover the wrongdoing at an earlier time. ERISA imposes no duty on plan fiduciaries to continuously audit operational affairs. Rather, courts have held that a duty to investigate only arises when there is some reason to suspect that investing in company stock may be imprudent—that is, there must be something akin to a "red flag" of misconduct. *See*, *e.g.*, *Barker v. American Mobil Power Corp.*, 64 F.3d 1397, 1403 & n.4 (9th Cir. 1995); *In re Dynegy, Inc. ERISA Litigation*, 309 F. Supp. 2d 861, 882 (S.D. Tex. 2004). This is essentially the plaintiffs' theory, and they propose two such red flags.

The plaintiffs first contend that the February 2004 advertisers' lawsuit constituted a red flag. An initial problem with this argument is that it does not explain why the plaintiff class includes participants whose accounts held shares in the ESOP as far back as December 2002. More importantly, however, the advertisers' lawsuit cannot be a basis for liability because, when it was filed, Tribune and ABC *did* commence an investigation into the accuracy of the circulation figures. This investigation eventually ferreted out the circulation fraud, which was purposely

designed to be concealed from Tribune and its auditor. It would have made little sense for the plan fiduciaries to commence an independent investigation at the same time. And, as we discussed in the context of our securities case, Tribune was entitled to a reasonable amount of time to investigate until it had a full story to disclose.

The other red flag the plaintiffs identify is the purported inadequacy of Tribune's internal controls. However, the only control deficiency specified in the complaint is the absence of a requirement that circulation managers certify their figures. To this, we again refer to our discussion of the securities case, in which we criticized the attempt to use subsequent remedial actions as a basis for allegations of this kind. Furthermore, there is no reason to infer that the absence of this additional procedure should have alerted the defendants to the misconduct at *Newsday* and *Hoy*, especially because Tribune's circulation figures were already being audited by a third party. Indeed, it seems that such a requirement would have been futile in this case because the same individuals who, as the complaint makes clear, concocted an elaborate scheme to overstate circulation would likely have no objection to certifying their fraudulent figures. And, for all the reasons we alluded to earlier in conjunction with our securities case, the fact that a fraud occurred and was eventually discovered says nothing about whether the defendants were on notice of potential problems beforehand. With nothing but pure speculation to support them, the plaintiffs' alleged red flags fail as a matter of law.

Nevertheless, the plaintiffs argue that the individual defendants' positions at Tribune are alone sufficient to support the contention that they knew or should have known about the circulation overstatements. The plaintiffs'

own disclaimer states that the defendants lacked actual knowledge of the underlying circulation fraud. So their argument becomes that the defendants, by virtue of their positions alone, should have possessed information that disclosed the misconduct. A conclusory statement that all defendants should have known specific facts about a company is generally insufficient to state a claim; it must be alleged that each defendant was in a position to know or learn of the information. *See, e.g.*, *Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079, 1089-92 (N.D. Ill. 2004) (collecting cases finding that allegations that a defendant was a member of a plan's investment committee is, without more, an insufficient basis for inferring that he should have been privy to certain company information).

The Committee defendants are all alleged to be "senior Tribune management personnel who should have been intimately aware of" Tribune's inadequate controls and the circulation scandal. But only four of these defendants are alleged to have held senior positions at Tribune, some are simply called "Senior Vice President" with no description of their job responsibilities, and two only held positions relating to benefits and human resources. Most of the board defendants were directors of Tribune during the class period, but they are not alleged to have been involved with the day-to-day operations and internal controls at *Newsday* or *Hoy*. Tribune is alleged to be one of the largest media and entertainment companies in the country. But even with its income inflated, *Newsday*'s revenues for 2002 represented only a small percentage of Tribune's total revenues, and *Hoy*'s percentage is even smaller. Previous to the advertisers' accusations, ABC had audited the *Newsday* and *Hoy* circulation reports without finding any irregularities, which refutes the suggestion that the fraud

should have been obvious to Tribune's senior management. The facts alleged are therefore inconsistent with any individual defendant having the knowledge necessary to have been alerted to the purportedly deficient controls and circulation fraud at the two newspapers.

Thus, the allegations do not support that the defendants should have known—either because they had a duty to investigate or by virtue of their positions at Tribune—about the circulation overstatements at *Newsday* and *Hoy*. However, even assuming *arguendo* that the defendants should have known about the misconduct, there is still an issue of whether they acted imprudently by continuing to offer and maintain Tribune stock in the plans. Here, we must be mindful of the delicate balance an ESOP fiduciary must achieve: he risks being sued for violating the plan if he diversifies but may impose unwanted risk on the participants if he doesn't. *Summers*, 453 F.3d at 410. As a result, "the plaintiff must show that the ERISA fiduciary could not have reasonably believed that the plan's drafters would have intended under the circumstances that he continue to comply with the ESOP's direction that he invest exclusively in employer securities." *Id.* (quoting *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995)); *see also Moench v. Robertson*, 62 F.3d 553, 571-72 (3rd Cir. 1995).

Comparing publicly available stock prices to the allegations in the complaint allows us to conduct a hindsight analysis of whether it was in fact imprudent to continue to invest in Tribune stock. The complaint alleges that Tribune stock was selling for about $52.00 per share in February 2004, when the first advertisers' lawsuits were filed. But the plaintiffs do not allege that the lawsuits drew much public attention or affected the stock's value. Instead, they argue that the truth began to emerge in June 2004. After

Tribune's first announcement regarding the overstatements on June 17, however, Tribune's stock closed, as we previously noted, at $47.27, up from $46.78 the day before. On June 18, it closed at $46.81, nearly the same level as the day before the announcement. The plaintiffs also focus on July 15 as the date Tribune began to more fully disclose the inflation, including an expected charge of $35 million. That day, the stock price dropped just 2.6 percent, from $43.12 to $42.00.

On September 10, another announcement was made, indicating there would be a total charge of up to $95 million against earnings. Three days later, Tribune stock closed at $39.72. The drop in price from July 15 to September 13 was $3.40, representing 7.9 percent of the July 15 price. As of November 30, however, the stock price had risen to $43.37—$0.25 above the July 15 price—even though there had been additional disclosures regarding circulation adjustments, but no additional reports of charges to income. Notably, the plaintiffs do not allege any disclosures in December 2004 that would have tied the $8.37 drop during that month to the circulation overstatements. This data refutes the plaintiffs' allegation that the disclosures regarding the overstated circulation figures caused a 25 percent drop in the value of Tribune's stock.

As Judge Hart correctly observed, even if the defendants possessed the power of clairvoyance, they would have foreseen a $90-$95 million charge against earnings due to the circulation fraud, representing less than 2 percent of one year's revenues for Tribune. Such circumstances would not cause a reasonable fiduciary to believe that the plan's drafters would have intended that he cease compliance with the ESOP's direction to invest exclusively in Tribune securities. Accordingly, if it were necessary to resolve this

issue, we would likely find that the complaint fails to adequately allege that the defendants acted imprudently by not discontinuing the company stock fund.

In sum, the allegations are insufficient as to all three claims. The first claim was correctly dismissed because the facts alleged do not support that the defendants should have been aware of obvious control deficiencies; thus, no duty to investigate was triggered. The second claim was also correctly dismissed because the facts alleged do not support that the defendants should have been aware of the circulation fraud; thus, they were not negligent in the allegedly inaccurate statements they made to plan participants. The third claim was correctly dismissed because it is premised on the first two rejected claims that the appointed fiduciaries breached their duties. Finally, we decline to discuss the plaintiffs' argument that they be granted leave to amend their complaint because they first voiced it at oral argument.

Accordingly, the judgment of the district court in both cases is AFFIRMED.