In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 17-2697

PENSION TRUST FUND FOR OPERATING ENGINEERS, *et al.*,

*Plaintiffs-Appellants*,

*v.*

KOHL'S CORPORATION, *et al.*,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 13-CV-1159 — **J. P. Stadtmueller**, *Judge*.

———————————

ARGUED JANUARY 16, 2018 — DECIDED JULY 12, 2018
AMENDED JULY 16, 2018

———————————

Before WOOD, *Chief Judge*, and ROVNER and HAMILTON,
*Circuit Judges*.

WOOD, *Chief Judge*. In September 2011, Kohl's Corporation
announced that it was correcting several years of its financial
filings because of multiple lease accounting errors. Hard on
the heels of that announcement came a putative class action
complaint. The plaintiffs, led by the Pension Trust Fund for

Operating Engineers, allege that Kohl's and two of its executives defrauded investors by publishing false and misleading information in the lead-up to the corrections. (For ease of exposition, we refer to the putative class as the Pension Fund.) The Pension Fund took the position that one can infer that the defendants knew that these statements were false or recklessly disregarded that possibility at the time they were made, because Kohl's recently had made similar lease accounting errors. Despite those earlier errors, it was pursuing aggressive investments in its leased properties, and at the same time, company insiders sold considerable amounts of stock.

The district court dismissed the complaint for failure to meet the enhanced pleading requirements for *scienter* imposed by the Private Securities Litigation Reform Act (PSLRA). The court entered that dismissal with prejudice, declining to give the Pension Fund even one opportunity to amend to cure the defects. The Pension Fund now appeals both the dismissal of the complaint and the district court's decision to enter it with prejudice. Because the first complaint fell short and the Pension Fund has not been able to suggest how an amendment might help, we affirm.

**I**

Kohl's runs over one thousand department stores across the United States. About 65 percent of those stores are leased—a fact that makes lease obligations a significant component of Kohl's financial picture. The treatment of those leases has caused Kohl's accountants and external auditors some trouble in recent years. The company was forced to adjust its accounting practices three times—in 2005, 2010, and 2011—to bring its books in line with generally accepted accounting principles ("GAAP"). The first and third of these

corrections were material and required the restatement of several years' worth of financial statements. The second was comparatively minor and required an adjustment to income in one quarter. The Pension Fund asserts that these recurring lease accounting errors show that Kohl's, its CEO Kevin Mansell, and its CFO Wesley McDonald were at least reckless in overseeing the company's lease accounting practices by the time of the second and third corrections. Specifically, the Pension Fund contends that purchasers of Kohl's stock from February 26, 2009, to September 13, 2011 (the "class period"), were defrauded by knowing or reckless false statements in Kohl's financial reports.

The Pension Fund advanced two theories of liability in the district court: securities fraud in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, against all defendants, and "controlling person" liability under section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), against Mansell and McDonald. We can limit our discussion to section 10(b) and Rule 10b-5, because a violation of those provisions is necessary to support a violation of section 20(a). *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

To state a claim under section 10(b), a plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) *scienter*; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* We can narrow our focus even further, for the *scienter* element is the only point of dispute between the parties. We review the sufficiency of *scienter* pleadings *de novo*. *Id.* at 692.

*Scienter* pleadings in securities fraud class actions must satisfy a heightened standard of plausibility. Through the PSLRA, Congress requires that plaintiffs "state *with particularity* facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). For a case under section 10(b), that state of mind is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).

The Supreme Court has told us that a complaint gives rise to a strong inference of *scienter* "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In making this determination, the allegations in the complaint "are accepted as true and taken collectively." *Id.* at 326. We must consider the relative probability of whether, taken as a whole, the false statements alleged here were "the result of merely careless mistakes at the management level based on false information fed it from below" or reflect "an intent to deceive or a reckless indifference to whether the statements were misleading." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008). If the latter inference is not at least as compelling as the former, dismissal is appropriate.

## II

Most of the Pension Fund's complaint recounts the details of the accounting errors and Kohl's financial restatements, but both sides argue that we need not wade too deeply into those

details. The Pension Fund insists that because Kohl's repeatedly made lease accounting errors, something is up—where there's smoke, there's fire. But this inference depends on how (dis)similar the errors are. Kohl's counters that technical accounting errors such as these are well below the pay grade of its executives. But leases are a significant part of Kohl's financial picture that cannot be expected to evade executive knowledge altogether. See *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (concluding that a "core-operations inference" can support *scienter* after *Tellabs*). We decline to take either simplistic approach. *Tellabs*'s repeated emphasis on looking at the facts "holistically" tells us that we must do more. 551 U.S. at 326. To apply the PSLRA meaningfully, we must dig deeper into the accounting and other allegations the Pension Fund has raised. After we have done this, we step back to look at what inferences can be drawn from the evidence as a whole.

### A

As detailed in the complaint, all three sets of errors were announced through SEC filings accompanied by press releases and on at least one occasion, an investor conference call. The first restatement came on February 22, 2005. Kohl's announced that it was adjusting the period over which its lease obligations were reported. GAAP does not allow firms simply to record lease obligations when they are paid; rather, firms must record start and end dates that reflect the economic reality of the lease. As part of the restatement, Kohl's adjusted how it calculated both the start and the end of lease terms. Previously, Kohl's had fixed the start of each lease term as the date when it began making payments; as revised, it would set

the start as the earlier of the date of first payment or first possession of the building. Similarly, Kohl's formerly set the end of the term at the conclusion of the initial non-cancelable lease term; as revised, it would recognize the lease through the *expected* term, including some cancelable option periods. These changes required Kohl's to restate its financial statements from 1998 through the third quarter of 2004.

Kohl's next set of accounting adjustments came in the fall of 2010. The company first identified the errors in November, before publicizing its final adjustments in December. These adjustments concerned (again) the start dates of the lease terms. It seems that Kohl's may have overcorrected in 2005. Kohl's had used the date of first possession as the start date for some leases even though the obligation to pay rent began earlier, contrary to its 2005 disclosures. Additionally, Kohl's adjusted depreciation expenses across the terms of some leases and corrected miscategorized incentive payments from landlords. Together, these changes were not material to past financial statements, but they resulted in a $50 million adjustment to income in the third quarter of 2010.

Finally, in August 2011 Kohl's announced that it had discovered another round of accounting errors. These errors were of a different type. This time, Kohl's had failed to reclassify many of its operating leases as capital leases after making significant investments in the affected stores. Operating leases have no impact on the balance sheet. Rental payments are expensed, the rented property is not counted as an asset, and future rent payments are not recognized as liability. By contrast, capital leases have a significant effect on the balance sheet. The leased property is recognized as an asset and future rent obligations as liabilities. Rental payments are treated not

as a rental expense, but instead as a combination of depreciation expense and interest expense.

These changes were significant—indeed, firms will often go to great lengths to keep their financial obligations off the balance sheet. See Paul B.W. Miller & Paul R. Bahnson, *Off-Balance-Sheet Financing: Holy Grail or Holey Pail?*, ACCT. TODAY (Oct. 11, 2010), https://www.accountingtoday.com/news/off-balance-sheet-financing-holy-grail-or-holey-pail-AT55794 ("Managers strive after [off-balance-sheet financing] like the Holy Grail … ."); but see Tom Petruno, *Why Corporate Leasing Practices Deserve More Respect*, UCLA ANDERSON REV. (Apr. 4, 2018), https://www.anderson.ucla.edu/faculty-and-research/anderson-review/leasing (arguing that reforms to operating lease rules "may be targeting an accounting abuse that is more imagined than real"). Whatever the firm's preference, GAAP requires leases to be categorized as capital when the economic reality of the arrangement makes the lessee more like the owner.

Simplifying the requirements somewhat, capital-lease treatment is required if ownership transfers to the tenant at the end of the term, if the tenant has the right to purchase the property well below its value, or if the term of the lease or lease payments amount to a significant portion of the property's value. In Kohl's case, McDonald suggested that Kohl's "strategies in negotiating leases and in renovating and constructing stores" created "ongoing financial interest[s]" in the leased buildings that warranted capital-lease treatment. "Material weaknesses" in its financial reporting "controls and procedures," however, allowed these misclassifications to go unnoticed. The next month, Kohl's restated its financial disclosures from 2006 through the second quarter of 2011, with

large effects on Kohl's balance sheet, but relatively minor effects elsewhere. According to the Pension Fund, Kohl's had understated its liabilities from about 26 to 39 percent annually and its assets from about 9 to 12 percent annually as a result of these errors.

The complaint supplements this chronology of accounting mistakes and corrections with some additional allegations supporting *scienter*. First, it alleges that Kohl's leasing strategies should have put its executives on alert for potential lease accounting issues. By aggressively "renovating and constructing stores," Kohl's should have known that capital-lease treatment was appropriate earlier on. Second, the Pension Fund finds highly suspicious a number of stock sales by Mansell, McDonald, and other company insiders. Mansell sold 138,000 shares for $7,676,400 in September 2009. McDonald sold 7,000 shares for $412,000 in September and October 2009, and 2,000 shares for $112,500 in November 2010. Seven other insiders also sold significant numbers of shares during the class period. The Pension Fund argues that these sales underscore that Mansell and McDonald knew that Kohl's financial statements were false or misleading when they were published.

B

Taking these facts together, the Pension Fund has made a strong case that many of Kohl's disclosures regarding its lease accounting practices turned out to be false. But that is not enough. The facts must also give rise to a strong inference of *scienter*. The complaint fails in this regard if it is more likely that the errors resulted from "careless mistakes at the management level" than from "an intent to deceive or a reckless

indifference to whether the statements were misleading." *Makor Issues & Rights*, 513 F.3d at 709. In contrast with the complaint's exhaustive account of the facts of Kohl's accounting mishaps, the Pension Fund gives us very few facts that would point either toward or away from *scienter*. This lack of connective tissue is determinative in this case. See *Tellabs*, 551 U.S. at 326 (noting that "omissions and ambiguities count against inferring scienter").

The Pension Fund argues that its strongest evidence of *scienter* is that Kohl's made similar and significant accounting errors in 2005, 2010, and 2011 related to a core part of its business. But these errors are not as similar as the Pension Fund suggests. True, one error from 2005 recurred in 2010 (misstating the start date of the lease), but that error led to a relatively minor restatement. The errors leading to major restatements in 2011 were wholly unrelated to the problems of 2005. The classification of leases and the length of lease terms implicate different lease accounting rules and affect firms' financial statements in very different ways. Shifting start or end dates moves expenses from one period to another, affecting net income across periods. The classification of leases, meanwhile, has its primary effect on the balance sheet. The impact and considerations are quite different, even if both involve leases.

The Pension Fund tries to overcome the differences between the 2005 and 2011 restatements by arguing that the 2010 and 2011 restatements should be taken as one. The representations in October and November 2010 that the changes would not be material are false, they say, because the 2011 problems were already known. The problem with this theory is that not only is the complaint devoid of evidence to support it—there is actually evidence in the complaint undermining

it. On June 28, 2011, just over a month before the 2011 lease accounting errors were discovered, Kohl's announced that it had secured a $1 billion credit agreement requiring a comprehensive review of its books. Without allegations of facts suggesting otherwise, the temporal proximity of these events suggests that an innocent explanation is more likely: the accounting errors were discovered during the comprehensive review mandated by contract. To the extent that making the same error again and again suggests recklessness, rather than negligence, the Pension Fund has failed to tell us why these errors are so alike as to make the recklessness inference at least as compelling as any other.

That the defendants were employing aggressive investment strategies in their leased properties is similarly of no help to the Pension Fund. Perhaps a reasonable person should have realized that the number of capital leases on Kohl's balance sheet should have increased as these investments were made. But the allegations do nothing to show why it was reckless, rather than just negligent, that Kohl's executives did not realize that something was amiss. Perhaps the executives had a motive to pretend nothing was amiss (though even that does not seem beyond dispute, as they might equally have wanted the most accurate financial picture possible), but a generalized motive common to all corporate executives is not enough to establish *scienter*. Otherwise, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009) (quoting *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002)). It is quite possible that Kohl's accountants or external auditors knew they were pushing the boundaries of GAAP to keep leases off the balance sheet, but their

knowledge is immaterial to the *scienter* of those making the statements. See *Makor Issues & Rights*, 513 F.3d at 708–09. Without more, we cannot say that Kohl's pursuit of aggressive leasehold improvements counsels for or against *scienter*.

Perhaps suspicious stock sales could tip the balance, but the insider trading allegations in this case do not. "[B]ecause executives sell stock all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Pugh*, 521 F.3d at 695. The plaintiffs argue that the sales in this case are suspicious because Mansell and McDonald made no sales at all in the year before the class period or in 2011. But that the individual defendants made sales in 2009 and 2010 but not in 2008 or 2011 is not enough to render the sales unusual. See *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 185 (4th Cir. 2007) ("[T]he complaint does not provide defendants' trading patterns outside the class period to permit comparison with their trades within the class period."); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (finding graphs showing trading seven months before and twelve months after the class period insufficient to show trades were suspicious or unusual). Once again, the Pension Fund has given us little to go on. The complaint tells us the date of sale, number of shares, and sale price for each trade, but nothing else. We do not know whether these sales were a high percentage of the individual defendants' holding; we do not know whether the individual defendants sold more shares than they typically would; we do not know if they bought more shares to offset their sales; we have no sense of the typical trading volume of Kohl's shares; and we do not know how Kohl's stock price fluctuated around these sales.

Perhaps we could overlook the complaint's lack of context if the stock sales resembled a smoking gun, but the probative value of stock sales depends greatly on timing. The most significant insider sales in this case were made in September 2009, 14 months before the 2010 corrections were announced and 23 months before the 2011 corrections were announced. These periods are more than long enough for any inference of suspicion to dissipate, at least in the absence of concrete facts suggesting otherwise. See *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 1002 (E.D. Wis. 2009); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) ("A broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter."). With nothing to indicate that these stock sales were unusual or suspicious, they cannot support an inference of *scienter*.

We have addressed these issues with the complaint one at a time, but we recognize that we need to look at the allegations as a whole. Unfortunately for the Pension Fund, this does not help. Each allegation in the complaint is advanced without any sense of how the dots connect. *Tellabs* requires that a complaint give rise to a "cogent and compelling" inference of *scienter*. 551 U.S. at 324. The Pension Fund tells us that Kohl's made similar, but not identical, lease accounting errors; that it did so while management was pursuing an aggressive store-improvement strategy; and that insiders sold stock during the same period. This could suggest wrongdoing, but it more plausibly suggests negligent oversight of overzealous accounting staff or some other breakdown lower in the corporate hierarchy. The Pension Fund has not taken the extra step to show why these allegations give rise to a strong inference of *scienter*, even considered collectively.

**III**

Although we agree with the district court that the complaint fell short of the PSLRA's requirements, that court was so unimpressed that it entered a dismissal *with* prejudice without further ado and refused to entertain an amended complaint. We repeatedly have said that "a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015). This admonition carries special weight in securities fraud cases because "[i]n this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Our final task is to determine whether the district court abused its discretion through its unusual departure from the standard procedure. *Foster v. DeLuca*, 545 F.3d 582, 583 (7th Cir. 2008).

The district court justified dismissal with prejudice because it thought that the court's prior rulings "put the plaintiffs on notice of weaknesses in the amended complaint … ." The district court was right that its prior rulings (which were issued by a different presiding judge) identified weaknesses with the complaint, but those weaknesses were unrelated to the reasons for which the complaint was later dismissed. In its order denying the defendants' first motion to dismiss without prejudice for relying too heavily on exhibits, the district court noted "ongoing concerns about the prolixity of the Amended Complaint—sixty-one pages, with 173 numbered paragraphs." Whatever the merits of the district court's criti-

cism, concerns about the complaint's length could not possibly alert the plaintiffs to problems with their *scienter* allegations. If anything, they reasonably might have thought that *more* length was necessary to meet the PSLRA's demanding standards for pleading *scienter*. The district court's earlier criticism thus does not help support the abrupt end of the case.

The defendants argue that the Pension Fund could not have been taken by surprise, because defendants had alerted the plaintiffs to the weaknesses of the complaint. This argument is a non-starter. If briefing in opposition to a motion to dismiss were sufficient basis to deny leave to amend after that motion were granted, there would be little left to the general rule we have just discussed. The only case the defendants cite to the contrary involved denial of leave to amend for the fifth time, when the defects had been identified by the motion to dismiss the second amended complaint. *Huon v. Denton*, 841 F.3d 733, 745–46 (7th Cir. 2016). In other words, the plaintiffs in *Huon* had already amended twice with full knowledge of what the defendants would argue. In the usual case, we look only to decisions of the court to determine whether the plaintiffs knew of faults with their complaint. See *Gonzalez-Koeneke v. West*, 791 F.3d 801, 806 (7th Cir. 2015) (pointing to "the deficiencies identified in the court's order granting the motion to dismiss"); *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010) ("But a formal motion for leave to amend was not necessary at the Rule 12(b)(6) stage, and the plaintiff was entitled to wait and see if any pleading problems the court might find could be corrected."). A litigant need not take the opposing side's legal position as gospel; indeed, it frequently would be unwise to do so.

Although there are problems with the district court's decision, and better practice might have been to allow one amendment, we find no reversible error here. At bottom, the district court was concerned that amendment would be futile, and the plaintiffs have done nothing before this court to dispel that notion. "[A] district court does not abuse its discretion by denying a motion for leave to amend when the plaintiff fails to establish that the proposed amendment would cure the deficiencies identified in the earlier complaint." *Gonzalez-Koeneke*, 791 F.3d at 807. While the plaintiffs did not have the opportunity to show what they would add before the district court dismissed with prejudice, they have had several opportunities since. They could have moved under Federal Rule of Civil Procedure 59(e) or 60(b) for another opportunity in the district court, see *Runnion*, 786 F.3d at 521, or they could have told us what more they would plead in their briefing. They took neither step. We asked at oral argument what the plaintiffs hoped to add if given the opportunity. Again, we were given no indication of what new material the plaintiffs could provide. Reversal is inappropriate if the plaintiff cannot identify how it would cure defects in its complaint. *Arlin-Golf, LLC v. Vill. of Arlington Heights*, 631 F.3d 818, 823 (7th Cir. 2011). The Pension Fund made no such showing in the district court or on appeal and is not entitled to another chance to do so.

## IV

The Pension Fund failed adequately to plead *scienter* and has not suggested how it would amend its pleadings to cure this defect. As a result, the judgment of the district court is AFFIRMED.

HAMILTON, *Circuit Judge*, concurring. I join the court's opinion in all respects. I write separately to highlight the interplay of Rule of Professional Conduct 4.2 and the demanding pleading standards adopted in the Private Securities Litigation Reform Act, and in particular the role of "confidential sources" in pleading a securities fraud case. The arguments in this case highlight the need for courts to avoid restricting or punishing plaintiffs' attorneys and investigators from contacting a wide range of current or former employees of a company they are considering suing.

This case arose in Wisconsin, where Kohl's has its headquarters. As adopted by the Wisconsin Supreme Court, Rule of Professional Conduct 4.2(a) provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

When a lawyer's client is adverse to an organization, such as a corporation like Kohl's, Rule 4.2(a) governs that lawyer's efforts to obtain information directly from current employees, officers, or directors of the adverse organization, without involving or obtaining consent from counsel for the organization. For those issues, however, the text of the rule does not offer much guidance. Comment 7 addresses that problem:

> In the case of a represented organization, this Rule prohibits communications with a constituent of the organization *who supervises, directs or regularly consults with the organization's lawyer*

*concerning the matter* or *has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.* Consent of the organization's lawyer is not required for communication with a former constituent. If a constituent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. See Rule 4.4. (Emphasis added.)

Rule 4.2(a) and comment 7 can be central to plaintiffs' ability to plead a viable claim for securities fraud under the PSLRA. As a practical matter, the PSLRA requires plaintiffs' lawyers to conduct extensive pre-complaint investigations. They must investigate without the help of formal discovery tools. As a result, information provided voluntarily by current or former employees may be helpful or even essential for plaintiffs trying to allege fraud, and especially fraudulent scienter, with sufficient particularity. See, e.g., *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 711 (7th Cir. 2008); *In re Daou Systems, Inc.*, 411 F.3d 1006, 1015–16 (9th Cir. 2005) (reversing in part dismissal where plaintiffs relied on confidential information from current employees and provided sufficient detail); *Novak v. Kasaks*, 216 F.3d 300, 313–14 (2d Cir.

2000) (plaintiffs did not need to identify confidential sources in complaint).[1]

Before filing a complaint, plaintiffs' lawyers have no way to compel testimony from the prospective defendant's employees, current or former. Subject to Rule 4.2(a), however, they can reach out to former and current employees and seek information from those willing to provide it voluntarily. Such information can sometimes be critical in defeating a motion to dismiss a complaint. See *Tellabs*, 513 F.3d at 711–12 (reversing dismissal).

On the other hand, when the plaintiffs' lawyers have *not* obtained information from the defendant's current or former employees, courts can expect the defendant to highlight that point. Kohl's has done just that here, in its brief (pages 3 and 23) and in oral argument.

Fair enough. Plaintiffs are not required to plead information from confidential sources, but they can certainly help build a case, as defense counsel understand very well.

What prompts this concurrence are the problems that can arise when aggressive lawyers for the corporation or other organization try to stretch the coverage of Rule 4.2(a) and its comment 7 to deter or prohibit plaintiff's counsel from contacting broad groups of current employees in search of such

---

[1] As the cited cases indicate, such current or former employees often ask for confidentiality, at least as long as it can be maintained legally. The securities laws provide employees with protection against retaliation for providing information about suspected securities fraud, see 18 U.S.C. § 1514A(a), but the statute is relatively narrow. Also, the prospect of a right to file a lawsuit offers only limited comfort to employees who might risk their jobs by helping others pursue a lawsuit against their employer.

supporting information. Cf. *Weibrecht v. Southern Illinois Transfer, Inc.*, 241 F.3d 875, 881 (7th Cir. 2001) (analyzing pre-amendment version of Rule 4.2, affirming district court finding that plaintiff's counsel violated rule by contacting captain of defendant's tugboat, but vacating sanction of dismissal with prejudice). It is not my purpose to provide a treatise on this subject, and results may vary from state to state. Nor do we have any indication of such overreach in this case.

Given the potential importance of such information from current or former employees more generally, my purpose is simply to caution courts and lawyers that Rule 4.2(a) and comment 7 were amended in 2002 to allow lawyers to contact directly broader categories of employees or other constituents of adverse organizations. These considerations can apply in a wide range of cases, of course. Parties often have trouble paying for formal depositions of potential witnesses. Such access may be especially important in cases covered by the PSLRA. Proof of scienter focuses on the most senior officers of the defendant, but many lower-level employees are likely to have relevant information in cases with viable claims for fraud. Undue restriction of access to those employees or other constituents can also lead to reversal of favorable judgments. See, e.g., *Palmer v. Pioneer Inn Assoc., Ltd.*, 338 F.3d 981 (9th Cir. 2003) (ordering new trial in employment discrimination case).[2]

---

[2] Other courts and authorities have addressed these problems in more depth. See, e.g., *Goswami v. DePaul University*, 8 F. Supp. 3d 1004 (N.D. Ill. 2014); *Snider v. Superior Court*, 7 Cal. Rptr. 3d 119 (Cal. App. 2003) (granting writ of mandamus to vacate sanctions impose for permissible contacts with adverse corporation's current employees); *Wagner v. City of Holyoke*, 183 F. Supp. 2d 289 (D. Mass. 2001) (applying rule before amendment of comment); Burt & Cook, *Ethical Considerations concerning Contacts by Counsel or Investigators with Present and Former Employees of an Opposing Party*,

38 St. Mary's L. J. 963 (2007); Wis. Ethics Opinion E–07–01 (see particularly the helpful discussion of reasons for 2002 amendments to comment).