In the

# United States Court of Appeals
## For the Seventh Circuit

No. 07-1895

JOSEPH J. NELSON and MICHAEL WYCOFF,
on behalf of a class,

*Plaintiffs-Appellants*,

*v.*

JOHN R. HODOWAL, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:02-cv-0477-DFH-TAB—**David F. Hamilton**, *Judge*.

ARGUED NOVEMBER 30, 2007—DECIDED JANUARY 2, 2008

Before EASTERBROOK, *Chief Judge*, and FLAUM and
WILLIAMS, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Indianapolis Power & Light
Company maintains not only a defined-benefit pension
plan but also a defined-contribution supplemental plan
called the "Thrift Plan." The defined-benefit plan holds
a diversified portfolio of investments; the defined-con-
tribution plan initially limited employees to holding stock
of IPALCO Enterprises, Inc., the employer's parent corpora-
tion, or bonds issued by the United States. Employees
may contribute to the Thrift Plan an amount that depends
on §401(k) of the Internal Revenue Code. The employer

matches these contributions up to 4% of an employee's annual salary.

In 1995 the Thrift Plan was amended to allow participants to diversify their investments. By 2000 the Plan was offering nine options, from very conservative (a money-market fund) to risky (IPALCO stock and nothing else), with several bond funds and mutual funds in between. The Plan hired Merrill Lynch, Pierce, Fenner & Smith, Inc., to advise the participants about appropriate investments; Merrill Lynch stressed the benefits of diversification. The Plan allows participants to change investments among the nine options daily, with no need for advance notice. But as of 2000 all of the employer's matching contributions were allocated to IPALCO stock; the Plan's terms made this mandatory.

IPALCO merged with AES Corporation on March 27, 2001. The merger had been approved by IPALCO's board of directors in July 2000 and by the shareholders that October. AES offered a premium of 16% relative to the price at which IPALCO's stock had traded the day before the announcement. Between July 2000 and March 2001 Merrill Lynch distributed literature to the Thrift Plan's participants and held meetings at which all options, including moving investments from IPALCO's stock to one of the mutual funds, were discussed. By the time of these meetings investors no longer needed to hold IPALCO's stock to obtain the merger premium; the price of IPALCO's stock had climbed in the market to reflect the value of the AES stock that it would soon become (less a small discount to reflect the chance that the merger would be called off). Nonetheless, when the merger closed about 64% of investments in the Thrift Plan were held as IPALCO stock ($145.4 million of the Plan's total assets of $228.1 million).

AES was, and is, a much larger firm than IPALCO. It operates energy businesses around the globe, and the value

of its stock in the market reflects not only the acumen of its managers but also the energy policies of many foreign nations, plus the exchange rate between the dollar and the currencies in which AES does business. How Indianapolis Power & Light performs has but modest influence on the market price of AES stock. When the merger closed, AES was trading for $49.60 a share. Three months later it was at $42.28. On September 25, 2001, AES was trading for $24.25, and the bottom dropped out the next day: AES fell to $12.25. It reached a low of $4.11 on February 21, 2002. The record does not reveal the reasons for the collapse in price.[†] We do know that, although the firm suffered red ink in 2001 and 2002, it continues to be a substantial enterprise. Its revenues in 2000 were $6.7 billion, with a profit of roughly $1.40 a share. In 2006 its revenues were $12.3 billion and its earnings per share 43¢. The stock closed on December 18, 2007, at $21.58. That is still a substantial loss compared with the price in March 2001—not only in absolute terms, but also relative to the stock market, which is higher today than in March 2001.

Two of the Thrift Plan's participants filed this class-action suit under the Employee Retirement and Income

---

[†] Though an article in the New York Times gives the general idea: "There are problems in Venezuela, Brazil and Argentina, which used to be its biggest profit centers. A subsidiary in Britain is in default on loans, and AES faces several lawsuits in California, where it is one of the companies blamed for soaring electricity prices in 2000." Floyd Norris, "They Had Fun, Fun, Fun Till the Stock Fell," *New York Times* Mar. 29, 2002 (available at http://query.nytimes.com/gst/fullpage.html?res= 9C00E5DE1F3BF93AA15750C0A9649C8B63&n=Top/News/ Business/Companies/AES%20Corporation). The article adds that some of the loans that AES carried on its books as nonrecourse allowed the creditors to convert the debt to stock, which created the possibility that other investors could be diluted when AES had to issue extra shares at the lower market price.

Security Act (ERISA) against the Plan's fiduciaries. The principal contention was that the fiduciaries (all of whom were executives at Indianapolis Power & Light) should have seen the decline coming, or at least should have understood that AES is too volatile to be a suitable investment for pension holdings, and therefore had to *compel* all of the participants to exchange their IPALCO stock for the Plan's other investment options before the merger closed. See 29 U.S.C. §1104 (obligations of fiduciaries), §1132(a)(2) (authorizing suit to recoup losses to a plan). Both the Supreme Court, in *LaRue v. DeWolff, Boberg & Associates*, No. 06-856 (argued Nov. 26, 2007), and this court, in *Rogers v. Baxter International, Inc.*, No. 06-3241 (argued Nov. 2, 2007), have under advisement cases posing questions about the extent to which §1132(a) authorizes suits seeking recoveries by defined-contribution plans, whose participants may have made different choices and thus were affected differently by the fiduciaries' conduct. But the precise scope of §1132(a) does not affect subject-matter jurisdiction, and as defendants have not argued that this suit falls outside §1132 we need not hold this appeal for *LaRue* or *Rogers*.

The district court held a bench trial and found essentially every disputed fact in defendants' favor. 480 F. Supp. 2d 1061 (S.D. Ind. 2007). The judge concluded that the defendants had no reason to foresee any decline in the price of AES's stock (had, indeed, no inside information about AES) and that reasonable fiduciaries would have deemed AES a suitable stock. (For long-term investors, a stock's volatility may be a benefit, as higher risk usually is associated with higher return unless the risk is fully diversifiable. See Turan G. Bali, *The intertemporal relation between expected returns and risk*, 87 J. Fin. Econ. 101 (2008). A pension fund can ride out the ups and downs and reap the rewards of risk-taking.) Although participants' concentration in AES left them underdiversified—

and without the offsetting incentive that IPALCO stock offered by linking the employees' fates with that of their employer—the fiduciaries adequately warned participants, directly and through Merrill Lynch, of that risk. The district court concluded that an ERISA fiduciary is not obliged to strip participants of the ability to make their own decisions, for good or ill. Nor, the judge concluded, were the fiduciaries obliged (or even allowed) to disregard the Plan's provision requiring all of the employer's contributions to be held as IPALCO (and then AES) stock.

Plaintiffs have abandoned on appeal all but one of the arguments they presented to the district court. The last issue remaining in dispute between the parties is whether the defendants had to tell the participants that the defendants were selling most of their own stock in IPALCO—not only stock held through the Thrift Plan, but also stock that the defendants were able to acquire by exercising vested options that they had received in their roles as managers or directors of Indianapolis Power & Light. Plaintiffs accuse the defendants of promoting AES as a good prospective employer (and implicitly as a good investment), while by divesting their own holdings they demonstrated that their true beliefs were otherwise. This is the sort of implied deceit that is called scalping in securities law. Compare *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963), with *Lowe v. SEC*, 472 U.S. 181 (1985). The district judge found, however, that the defendants actually (and reasonably) believed everything they told the participants, and that they sold IPALCO stock, and cashed out their options, only because AES had announced that it would replace the management team at Indianapolis Power & Light. The defendants were on their way out the door and had no more reason to hold IPALCO (or AES) stock than to hold any other utility stock, and substantial reasons to diversify. The plaintiffs and their class, however, were remaining

as AES's employees and so, the defendants believed, had less reason to sell.

None of these findings is challenged as clearly erroneous. Instead plaintiffs maintain that, even though the defendants' sales did not imply any belief that AES was overpriced in the market or an unsuitable investment for the Thrift Plan's ongoing participants, defendants should have told each of the participants point blank that the fiduciaries were getting out while the going was good. The district court observed that the defendants *had* disclosed their sales by filing the appropriate forms under §16(a) of the Securities Exchange Act of 1934. See 15 U.S.C. §78p(a); 17 C.F.R. §240.16a–2. This information not only was known to the stock market in the fall of 2000— long before the closing—but also did not affect the price of AES stock. Securities law assumes that markets for widely-traded stock such as AES are efficient and impound all publicly available information. See, e.g., *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). This implies that information that, when revealed, has no effect on a stock's price is not "material" to investors' decisions. See *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1130 (7th Cir. 1993). Plaintiffs do not contest any of these conclusions.

Thus the case boils down to an argument that an ERISA fiduciary has a duty to disclose, directly to a pension plan's participants, even non-material information that may affect the participants for reasons unrelated to the value of the investment. Plaintiffs insist that many of the participants would have sold IPALCO as soon as they learned of the managers' decisions, not because the information actually affected the stock's value (or suitability) but just because they wanted to copy the managers' investment strategies as an information-conservation device.

Plaintiffs observe that ERISA requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" (29 U.S.C. §1104(a)(1)(B))—and the defendants' sales of their own IPALCO stock tell us (plaintiffs insist) that defendants recognized that prudent men would have sold the IPALCO stock before the merger. This does not sidestep the district judge's conclusion that the defendants sold for reasons that did not apply to persons who would remain employees of Indianapolis Power & Light after the merger. The market's non-reaction to news of defendants' sales shows that their decisions did not reflect anything about the value of IPALCO or AES stock.

There remains a possibility that participants in the Thrift Plan would have misunderstood the reasons for, and the significance of, defendants' sales, and changed their own investment allocations for that reason, but no regulation or decision requires ERISA fiduciaries to disclose facts that may lead to idiosyncratic reactions. *Any* tidbit might cause such a reaction; the materiality requirement entitles fiduciaries to limit their disclosures and advice to those facts that concern real economic values. In the language of securities law, a non-disclosure that may affect a person's choice about which securities to hold, but does not relate to the value of those securities, yields transaction causation but not loss causation. And without loss causation there is no liability. See *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).

A better line of argument would rely on 29 U.S.C. §1104(a)(1)(C), which requires fiduciaries to diversify "the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so". Defendants diversified their own

portfolios and might have done more to promote diversification by other participants. Diversification is valuable even when each security is accurately priced by the stock market. See Bevis Longstreth, *Modern Investment Management and the Prudent Man Rule* (1986). Although the defined-benefit plan was already diversified (and worth more to most employees than their supplemental investments in the Thrift Plan), additional benefits were available from diversifying investments in the Thrift Plan. But here is where it matters that defendants *did* disclose their own sales—not, to be sure, directly to each participant, but in public filings with the SEC and the stock markets. Rank-and-file workers at Indianapolis Power & Light don't read such filings, but investment analysts do—and defendants caused the Thrift Plan to hire Merrill Lynch to provide advice to each participant personally. Nothing was hidden from Merrill Lynch.

A trustee's duty to furnish information to beneficiaries, on which see *Restatement (Third) of Trusts* §82 (T.D. 4, 2005), may be discharged directly or through an intermediary such as Merrill Lynch. Often delegating the function to a specialist is best for a novice investor. Employees who participated in the Thrift Plan may have had little idea what to make of raw information such as the steps defendants took to cash out their stock options. But counselors from Merrill Lynch could put the defendants' sales in context with other information. As we have already mentioned, Merrill Lynch was engaged in part to promote intelligent diversification once extra investment options were offered in 1995. Plaintiffs have not referred us to any regulation or judicial decision obliging fiduciaries to disclose directly to participants rather than through professional investment counselors. Sometimes trust law *requires* delegation to a professional such as Merrill Lynch. See *Restatement (Third) of Trusts* §80(2) & comment d(1) (T.D. 4, 2005). ERISA does not

hold a fiduciary responsible for the decline in an investment's value, when an informed and independent investment adviser has been furnished without charge to all beneficiaries, who exercise full control over which investments their accounts will hold.

AFFIRMED

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*