Don **BRIEGER**, Harry Schultz, Robert Becker, and Alan Burstin, individually and on behalf of all others similarly situated, Plaintiffs,

v.

**TELLABS, INC.**, Tellabs Operations, Inc., Richard C. Notebaert, Michael J. Birck, Brian J. Jackman, Debra Ragusa, Michael C. Smiley, and Joan E. Ryan, Defendants.

Case No. 06 C 1882.

United States District Court,
N.D. Illinois,
Eastern Division.

June 26, 2009.

Donna Siegel Moffa, James A. Maro, Peter A. Muhic, Katherine B. Bornstein, Barroway Topaz Kessler Meltzer & Check, LLP, Radnor, PA, Norman Rifkind, Lasky & Rifkind, Ltd., Chicago, IL, Matthew M. Houston, Harwood Fefferllp, New York, NY, for Plaintiffs.

Charles Clark Jackson, Amy Marie Foran, Deborah S. Davidson, Julia Y. Trankiem, Kirsten Milton Evans, Sari M. Alamuddin, Morgan, Lewis & Bockius LLP, Chicago, IL, for Defendants.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

MATTHEW F. KENNELLY, District Judge:

Plaintiffs Don Brieger, Harry Schultz, Robert Becker, and Alan Burstin, on behalf of themselves and a certified class, have sued defendants Tellabs, Inc. (Tellabs or the company), Tellabs Operations, Inc., Richard C. Notebaert, Michael J. Birck, Brian J. Jackman, Debra Ragusa, Michael C. Smiley, and Joan E. Ryan for alleged breaches of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1109 & 1132. The Court certified a class of plaintiffs on September 19, 2007. *See Brieger v. Tellabs, Inc.*, 245 F.R.D. 345 (N.D.Ill.2007). The class was defined as "[a]ll persons who were participants or beneficiaries of the Tellabs, Inc. Profit Sharing and Savings Plan at any time between December 11, 2000 and July 1, 2003 and whose accounts included investments in Tellabs stock." *Id.* at 357.

The case was tried in a bench trial over eight days from April 13 to May 7, 2009. Following the close of evidence, the parties submitted proposed findings of fact and conclusions of law, collectively totaling over 330 pages. The Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. To the extent any findings of fact are deemed conclusions of law, they shall be considered conclusions of law and vice versa.

### Findings of Fact

**1. Tellabs and the Tellabs Advantage Program**

Tellabs was founded in the 1970s by Birck and several others. It designs and manufactures equipment used in the telecommunications industry. Tellabs also sells installation, engineering, and maintenance services to purchasers of its prod-

ucts. Birck was the CEO of Tellabs from its inception until mid–2000. After he resigned as CEO, Birck remained on Tellabs' board of directors, serving as chairman. Notebaert replaced Birck as CEO. He remained in that position until June 2002, when he left Tellabs to become the CEO of Qwest. After Notebaert's departure, Birck resumed his former role as CEO of Tellabs for the remainder of the relevant period. Ryan was Tellabs' CFO throughout most of the relevant period. Jackman was a Tellabs executive vice president until August 2001 and a member of the board of directors until April 2002. At various times, Birck, Notebaert, Ryan, and Jackman would speak to Tellabs employees, market analysts, and the general public on a wide array of issues concerning the company.

Tellabs established a retirement and savings plan known as the Tellabs Advantage Program (the Plan). Two components of the Plan were the Tellabs Savings and Profit Sharing Plan and the Tellabs Retirement Program. The Plan was an employee pension benefit plan as defined by ERISA. *See* 29 U.S.C. § 1002(2)(A). Employees had individual accounts within the Plan. The Plan stated that it was designed to help Tellabs employees prepare for retirement.

Tellabs utilized two committees to oversee the Plan. One was known as the investment committee. The investment committee met annually and had ultimate authority for selecting investment options for the Plan. At various times relevant to this case, defendants Birck, Notebaert, Jackman, and Ryan were members of the investment committee. The administrative committee oversaw the day-to-day operations of the Plan and made recommendations to the investment committee. The administrative committee formally met at least quarterly, and sometimes more frequently. Members of the administrative committee regularly attended investment committee meetings, though the reverse did not occur. Defendants Ragusa and Smiley were members of the administrative committee. Tellabs' board of directors appointed the members of both committees.

Tellabs hired Hewitt Financial Services to administer the Plan on a day-to-day basis in conjunction with the administrative committee. The members of the administrative committee were Hewitt's primary contacts at Tellabs. Hewitt kept the Plan's records, processed participant transactions, maintained online services for the participants, and sent out account statements. Hewitt also played a limited role in evaluating mutual funds that were included as investment options for the Plan. Hewitt never evaluated, however, whether Tellabs stock should be included or remain as an investment option.

An employee could elect to make contributions to the "savings" portion of the Plan, which Tellabs matched in an amount up to three percent of the employee's income in 2000 and 2001, and subsequently four percent. The matching contribution made by Tellabs was allocated in the same manner as the employee's contribution. An employee could direct his contributions to the savings component of the Plan into any of the investment choices offered by the Plan. Each individual employee determined how to allocate his or her investments among those choices. The Plan offered eleven or twelve different investment choices at any given time. Those spanned an array of investments, from different types of growth and value stock and bond funds to more conservative money market investments. One fund consisted solely of Tellabs stock. The Tellabs stock fund was the only single-security investment offered to the Plan participants.

Under the "retirement" portion of the Plan, Tellabs contributed five percent of each employee's salary to his or her Plan account. Of that contribution, one-half of one percent was automatically invested in the Tellabs stock fund. Each employee selected how the rest of the contribution would be allocated, except that it could not be invested in the Tellabs stock fund. Tellabs also contributed to the retirement portion of the Plan up to one week of an employee's unused, otherwise forfeited vacation time. The contribution for the rollover of vacation time was made to the Tellabs stock fund. Employees could not transfer the vacation rollover or the company contributions to the Tellabs stock fund until they reached the age fifty-five.

Tellabs provided its employees with information regarding their participation in the Plan and the various available investment options. Employees received information regarding how to select the investments according to their goals and circumstances. They were also informed of the general risk levels associated with each investment. The Tellabs stock fund was clearly denoted as the riskiest investment option, due to the fact it was the only single-security fund available. Information regarding the investments and the Plan was provided both in written materials distributed to employees and in presentations conducted by members of Tellabs' human resources department, including Ragusa. Quarterly statements were mailed to each of the Plan participants containing information on the performance of all of their investments. Those statements were also available online.

Tellabs also provided its employees with extensive information regarding the company itself, how it was performing, and how senior management expected it would perform in the future. Employees had access to a Tellabs intranet website that contained numerous news articles about the company, a daily update of its stock price, and links to websites where participants could review and alter their investment choices in the Plan. Tellabs also e-mailed employees a weekly newsletter containing much of the same information, called "This Week at Tellabs." Hard copies of the newsletter were made available for employees who did not work at computers. Executives, including Birck, Notebaert, Ryan, and Jackman regularly conducted "town hall" meetings, at which employees were able to ask questions. Transcripts or recordings of those meetings were made available to employees unable to attend. Employees also had access to transcripts of telephone conferences between senior executives and outside analysts.

## 2. Selection of investment options for the Plan

The Plan's investment committee was responsible for selecting the investment options available to Tellabs employees. The Plan provided that the investment committee had the power and duty:

> (I) to establish investment guidelines and objectives for the investment of the Trust Fund and each investment Fund as a part thereof, including, but not by way of limitation, the establishment of additional investment funds or the consolidation of one ore more of the existing funds....

JX 8 at TL–ERISA 6857. The Plan defined "Funds" as "the separate investment funds as described in Section 5.2." *Id.* at TL–ERISA 6802. Section 5.2(a) of the Plan provided that the Plan's assets would be held in a common trust fund that in turn was divided into the separate funds for each investment. The Plan specified that one of its "Funds," the "Tellabs Stock Fund," was "the Fund described in Section

5.2 (Common Fund)." *Id.* at TL–ERISA 6810.

> The Plan required that
>
> [e]ach Fund shall be established and invested ... in accordance with investment policies determined ... by the Investment Committee.... The Investment Committee may from time to time also direct that Funds be terminated or that Funds with similar investment objectives be consolidated. Subject to the Investment Committee's authority to consolidate, Funds shall be maintained for the various types of Accounts as follows:
>
> (I) At least one Fund shall be established, maintained and invested with the objective of minimizing the effect of market fluctuations while producing a rate of return consistent with such objective.
>
> (ii) A second shall be established, maintained and invested in the common stock of Tellabs, Inc....
>
> (iii) An additional Fund or Funds shall be established, maintained and Invested as the Investment Committee may from time to time direct.

JX 8 at TL–ERISA 6824–25. The Tellabs Master Retirement Savings Trust, similar to the Plan itself, contained language regarding the powers of the investment committee and the assets the Plan was required to hold:

> The Trust Fund shall be composed of assets of the Company Stock Investment Fund which shall be invested as herein provided, and any other Investment Fund designated in writing by the Investment Committee, which writing shall prescribe the investment policy for each Investment Fund. The Investment Committee is authorized to terminate existing investment Funds....

JX 58 at TL–ERISA 158. The investment policy created by the investment committee also stated that Tellabs could change the set of investment options available to employees if it was appropriate to do so.

This case concerns one of the Plan's investment options, the Tellabs stock fund. That fund was comprised almost entirely of Tellabs stock, except for a small cash component used to effectuate purchases and sales without incurring high transaction costs. The Plan's investment policy statement stated that the Tellabs stock fund was intended to permit employees "to benefit from the success of Tellabs through exposure to its common stock." JX 62 at TL–ERISA 430.

During the class period, the investment committee removed two of the Plan's investment options because they were not performing as well as the committee expected. Those changes followed the recommendations of Hewitt and the administrative committee. Neither the investment committee nor the administrative committee ever considered divesting the assets in the Tellabs stock fund or ceasing contributions into that fund on behalf of employees. Nor do the minutes of any of the committees' meetings reflect any discussion about the continued inclusion of the company's stock as part of the Plan. Moreover, the committee members did not consult with Hewitt on this issue, even though Hewitt reviewed other Plan investment options and made recommendations on changes to those options. The committees did not consult with, appoint, or consider appointing an independent fiduciary to make decisions with respect to the Plan generally or the Tellabs stock fund specifically. The committee members also did not discuss Tellabs' business prospects, either in general or with respect to particular products, at investment or administrative committee meetings.

Even though the Tellabs stock fund was never a topic at the administrative or in-

vestment committee meetings, defendants presented credible evidence that the members of both committees were aware of the performance of the stock price and of Tellabs' ongoing business prospects, by virtue of their service as executives and high ranking employees of the company.

The parties disagree over whether the documents governing the Plan, cited and quoted in the foregoing paragraphs, required the Plan to offer Tellabs stock as an investment option, or whether the investment committee had discretion to remove the company's stock from the Plan. Defendants believed that the Plan was required to offer Tellabs stock as an investment option. Plaintiffs argue otherwise.

### 3. Tellabs executives and key products

At the times relevant to this lawsuit, Tellabs' most important products were manufactured by a division known as the optical networking group (ONG). The ONG accounted for more sales than any other Tellabs division and manufactured Tellabs' best-selling product, the TITAN 5500 (5500). The 5500 was often referred to as Tellabs' "flagship" product. Telecommunications carriers, including Sprint and Verizon, were among the largest customers for the 5500.

Another ONG product was the TITAN 6500 (6500). The 6500 was a new product that Tellabs began selling in late 2000 and early 2001. At that time, Tellabs envisioned that the 6500 would be its next big seller and would eventually take the 5500's place as Tellabs' leading product. Due to accounting rules regarding the sale of new products, Tellabs was unable to recognize revenue from a sale of the 6500 until various criteria were satisfied, including a customer's successful operation and formal acceptance of the 6500.

Tellabs had also acquired a company called SALIX for $300 million in stock in early 2000. A third line of Tellabs' products was the SALIX 7000 series. SALIX was another one of Tellabs' product lines that was poised to become one of its best sellers in the future. Tellabs forecasted, however, that in 2001 SALIX would generate only modest revenue.

### 4. The decline of Tellabs' business and stock price

The year 2000 and the fourth quarter of that year had been a record-setting period for Tellabs. The company generated greater revenue during that period than ever before, fueled in large part by sales of the 5500. Defendants expected that Tellabs' growth and strong performance would continue into the year 2001 and beyond. Accordingly, Tellabs forecasted that in 2001 both revenues and net profits would increase by thirty percent. Those growth projections were communicated to the general public and to Tellabs employees.

Tellabs' plans and expectations for continued growth began to unravel during the first quarter of 2001, though, as explained below, the severity of the situation was not immediately apparent. Weekly updates, known at Tellabs as sanity checks, indicated that the company's sales through the first few months of 2001 were behind their targets for the quarter as compared to past years. That said, it had become common for a large percentage of Tellabs' quarterly sales to take place in the last two weeks of the quarter. During the first quarter of 2001, Tellabs also became aware that it was experiencing higher costs than expected, the time to sell its inventory had increased, and it might need to write off some excess inventory.

Before the end of the first quarter of 2001 Tellabs publicly revised its earnings expectations, lowering its performance forecast. Concerned that the company would not meet even the revised numbers,

Notebaert met with the company's director of global forecasting, Chris Pfefferle. Although sales remained slow, Pfefferle told Notebaert that Tellabs should meet the revised forecast based on feedback she received from sales teams and customers, as well as her own analysis of potential sales and opportunities. Nevertheless, Tellabs failed to meet its revised first quarter 2001 forecast.

Many of the problems Tellabs experienced were not unique to that company. Several of Tellabs' competitors, including Lucent and Nortel, experienced downturns before Tellabs did. By January 2001, Birck recognized that the marketplace in the telecommunications industry had changed. Defendants, however, believed that Tellabs would not be affected by these changes because of its recent performance and product mix, which they felt positioned the company better than its competitors. In the end, however, Tellabs did not prove to be immune from industry-wide problems.

The downward trend continued. Tellabs lost money in 2001 and 2002. Tellabs made numerous public statements about the situation as the downward trend continued. For example, in April 2001, Tellabs issued a press release stating it would "realign its expenses with its current expectations for lower revenue growth." JX 20 at TL–ERISA 6361. A few months later, in June 2001, Tellabs publicly announced another reduction in projected revenues. Throughout 2002 and 2003, various executives, including Birck and Notebaert, made public statements about the poor state of the telecommunications industry. Though at times they also made statements containing some optimism for a turnaround, those statements were couched with others acknowledging the

tough conditions that Tellabs and the telecommunications industry were encountering.

In February 2001, in response to forecast reviews and general developments in the telecommunications industry, Notebaert initiated a freeze on hiring new personnel at Tellabs. As business failed to improve in 2001, Tellabs was forced to take "decisive action to align its costs structure with its lowered growth expectations," i.e., drastically cut costs. Defs.' Proposed Findings of Fact & Conclusions of Law at 64. One of the primary ways Tellabs cut costs was to lay off employees. The first layoffs occurred in April 2001. Five more rounds of layoffs were conducted during the class period.[1] The salaries of remaining employees were frozen. In a further effort to reduce costs, Tellabs closed down the SALIX division in April 2001. The decision to shut down SALIX created accounting losses of over $100 million.

Despite its problems, Tellabs was never in danger of insolvency or bankruptcy. Even during times of negative profits, Tellabs often had positive cash flow. The company had very little debt and had over $1 billion of cash and cash equivalents on hand. Though having cash is certainly no guarantee against bankruptcy, that fact combined with Tellabs' aggressive management of its costs demonstrates that the company had the ability to get through its downturn, which it did. Plaintiffs contend bankruptcy was a real possibility for Tellabs based on an internal e-mail discussing the possible consequences of bankruptcy. The context of that e-mail shows that the issue of bankruptcy was discussed solely to respond to employee questions, not because any executives at Tellabs thought bankruptcy was a real possibility. Simi-

---

**1.** It was apparent from Birck's and Notebaert's testimony that instituting the layoffs was difficult for them, even though they be- lieved it to be in the best interests of Tellabs and its remaining employees.

larly, Notebaert's acknowledgment that Tellabs would have been unable to obtain a line of credit from a bank did not mean that defendants thought the company could go under.

The negative developments resulted in a precipitous drop in the value of Tellabs stock over the course of the class period. On the first day of the class period, Tellabs stock closed at $63.19 per share. By the end of the class period, the price of Tellabs stock had fallen to $6.58 per share.

## 5. Defendants' alleged misrepresentations and omissions

Plaintiffs contend that defendants made misrepresentations to them and to the public in general regarding Tellabs' business and that they failed to disclose information that plaintiffs needed in order to make informed decisions about the allocation of their contributions to the Plan.

First, plaintiffs contend that defendants made misrepresentations about the health of Tellabs despite being aware of sales problems with the 5500. For example, at a January 2001 teleconference with analysts, executives stated that Tellabs expected to continue growing and that 5500 sales would grow. At the time, defendants knew that 5500 sales were coming in more slowly than in the past. Nevertheless, defendants' public statements were consistent with the backlog of orders for the 5500, as well as internal forecasts and analysis of sales believed to be likely to close during the first quarter of 2001.

Plaintiffs also focus on several statements made by defendants with respect to the 6500. In January 2001, Notebaert stated that customer demand for the 6500 was huge. JX 42 at TL–ERISA 8723. He made similar comments again in March 2001. Plaintiffs contend these statements were misleading because there had been no new sales of the 6500 since late 2000. Defendants offered evidence, however, that Tellabs legitimately expected to make sales of the 6500 throughout 2001 based on communications with various customers, including Verizon and Sprint. Given this background, Notebaert's statements about demand for the 6500, and any similar comments by other defendants, were not misleading. Rather, they accurately reflected Tellabs' understanding of demand for the 6500 based on statements from customers and Tellabs' internal marketing and forecasting at the time. Though several customers eventually cited problems with the 6500 and slowed or ceased purchases of it, that did not occur until months after Notebaert made the statements that plaintiffs characterize as misrepresentations. *Compare* JX 42 at TL ERISA 8723; JX 1 TL–ERISA at 2161795; JX 8.2 at TL–ERISA at 274254; and PX 66 at TL–ERISA at 60628, *with* PX 118 TL–ERISA 267254; PX 57 at TL–ERISA 666912–13; and PX 63 at TL–ERISA at 645233. A notable example of this was when Verizon cut its expected 6500 order from sixty-seven to eleven units in May 2001.

About the same time, internal communications reflected that sales of the 6500 were coming in slower than expected. Plaintiffs also presented some evidence that the 6500 was having manufacturing, production, and testing problems. Tellabs recognized revenue for the first 6500 at Sprint in the second quarter of 2001, after Sprint completed successful operation and formal acceptance of a 6500 system that it had been testing. It was not until September 2001, however, that Tellabs satisfied the rules allowing recognition of revenue on shipped 6500 systems without successful operation and formal acceptance of each such system. Though true, these facts do not make defendants' statements about the 6500 misrepresentations. As noted above, Verizon, Sprint, and other customers continued to express interest in the 6500. Moreover, the fact that

revenue could not be recognized at the time of sale due to accounting rules did not mean that there was low demand for the product.

Another alleged misrepresentation concerned the announcement on December 11, 2000 of an agreement with Sprint for sale of the new 6500 product. Tellabs issued a press release stating that "Tellabs announced a multiyear agreement with Sprint for the TITAN® 6500.... The agreement is expected to be valued at more than $100 million over the life of the contract." Sprint approved the press release before Tellabs issued it. The press release contained a quote about the 6500 from a Sprint vice president. Plaintiffs contend that this announcement was a misrepresentation because no contract regarding the 6500 had been signed as of that date between Sprint and Tellabs, a contract was not signed until much later in 2001, and the eventual contract only required Sprint to purchase $75 million worth of various products, including the 6500, over several years. The Court disagrees with plaintiffs' contention. A former Tellabs executive, Richard Tatara, credibly testified that it was common for Tellabs to announce an agreement before a formal contract has been executed. The fact that Sprint approved the announcement before Tellabs made it lends further credence to the report of an agreement. Just as importantly, the evidence shows that Sprint did in fact purchase more than $100 million of 6500 units over a several year period. Thus nothing in the December 11, 2000 press release about the sale of 6500 units to Sprint was false. Sprint purchased exactly what Tellabs stated it would.

Plaintiffs also contend that defendants made misrepresentations regarding SALIX. First, the materiality of any SALIX misstatements is doubtful, as Tellabs executives stated that SALIX was not antici-pated to generate much in the way of sales or to have any significant impact on the company in the short term. Second, plaintiffs have not proven that defendants made any misrepresentations about SALIX. Though Tellabs projected that SALIX would generate a small amount of revenue in 2001 as late as March 23, 2001, it announced on April 18, 2001 that it was terminating the SALIX product line. The short time between these two announcements does not mean defendants knew SALIX would be shut down at an earlier date, and plaintiffs have not established that proposition. Rather, this is just one example of how Tellabs reacted to an evolving, worsening business environment. SALIX was terminated on short notice in order to quickly cut expenses.

More generally, plaintiffs point to a number of statements about Tellabs' prospects that they claim gave employees a false sense of optimism about Tellabs' future. One example is the revised earnings guidance Tellabs provided on March 7, 2001, lowering the first quarter 2001 revenue forecast, but stating that the company would still do well that quarter. This was supported with further statements about growth in 5500 sales. Plaintiffs compare that announcement to the February 19, 2001 letter from Notebaert to Birck, which appeared to paint a gloomier picture, including slow 5500 sales in the early part of 2001, as well as sanity check reports that showed slower sales. Defendants' statements were not misrepresentations. Though their predictions eventually proved wrong, at the time defendants made them, they were based on a significant backlog of orders, forecasts made by Pfefferle's department, and communications with customers. These facts, as well as the nature of Tellabs' products, led defendants to believe that Tellabs was in a unique position to weather the storm and even grow de-

spite general industry and market conditions.

Moreover, defendants' statements did not reflect unbridled optimism. Instead, they were tempered by contemporaneous public statements acknowledging the developing problems in the telecommunications industry. For example, on February 27, 2001, Birck told an investor conference that Tellabs was not immune to the reduction in capital expenditures by its customers and that January 2001 sales had been soft. A letter from Birck and Notebaert to shareholders sent earlier that month contained similar statements. Tellabs continued to revise its public forecasts downward throughout 2001, and on June 19, 2001, Notebaert noted during an investor teleconference that sales were down more than anticipated and that Tellabs was hearing a message of caution and concern from its customers. Notebaert and Birck continued to make statements to the public and to Tellabs employees about the downturn in the industry and reduced capital spending by Tellabs customers throughout the class period.

### 6. Expert testimony regarding procedural and substantive prudence

Plaintiffs presented expert testimony from Matthew Hutcheson, a certified pension examiner and independent fiduciary on over 100 occasions, regarding the issue of "procedural prudence," i.e., whether defendants engaged in a proper process to evaluate the continued inclusion of the Tellabs stock fund as part of the Plan. Hutcheson testified that prudent ERISA fiduciaries must engage in "eight steps ... in order to demonstrate a prudent process." Pls.' Am. Proposed Findings of Fact & Conclusions of Law ¶ 53. Most of those steps involve documenting (1) fiduciaries' understanding of their duties pursuant to ERISA; (2) the methodology the fiduciaries utilize to arrive at investment decisions; and (3) the thought process and questions asked at fiduciary committee meetings. Additionally, Hutcheson testified that prudent fiduciaries must obtain the services of an independent fiduciary when appropriate.

Hutcheson identified problems with defendants' conduct based on (1) their failure to document that they knew of and accepted their duties; (2) the paucity of detailed minutes from committee meetings; and (3) the fact that an independent fiduciary was not hired to make determinations and evaluations regarding the Tellabs stock fund. Based on these facts, Hutcheson concluded that defendants were procedurally imprudent.

Defendants countered Hutcheson's testimony with that of their own expert, Laura Starks, a professor of finance at the University of Texas and a member of the investment advisory committee for the Employee Retirement System of the State of Texas. Starks concluded that defendants engaged in a prudent process when evaluating the Tellabs stock fund. She based this conclusion on the frequency of the investment and administrative committee meetings, acknowledgment by the committees and Hewitt that Tellabs stock was the riskiest investment in the Plan, the fact that the committees were composed of high-level executives and employees at Tellabs, and the materials that Hewitt provided to committee members. Starks characterized Hutcheson's eight-factor test as elevating form over substance. She also noted that it was uncommon for companies to appoint independent fiduciaries to monitor investments in company stock held by ERISA plans.

In support of their claim that Tellabs stock was an inappropriate investment for the Plan during the class period (what they call "substantive prudence"), plaintiffs presented the expert testimony of Ronald Vollmar, an economic and financial valua-

tion consultant. Based on the letter Notebaert sent to Birck on February 19, 2001, Vollmar opined that Tellabs faced significant financial losses and was no longer a prudent investment as of that date. Vollmar also based his conclusion on information he believed was available only to Tellabs executives, Tellabs' unsustainable growth rates, and the combination of employment risk and retirement fund risk that results when employees invest their retirement assets heavily in their employer's stock. He did not, however, perform a quantitative analysis in support of his conclusion.

### Conclusions of Law

Plaintiffs contend that defendants breached their fiduciary duties in four separate ways. Their first claim is that defendants breached the fiduciary duty of prudence by allowing and holding investments in the Tellabs stock fund. Next, plaintiffs contend defendants breached their duty to honestly disclose material information. Third, plaintiffs claim that defendants breached their fiduciary duty of loyalty. Last, they contend that defendants breached their duty to monitor other fiduciaries affiliated with the Plan. The Court addresses each of these claims in turn, as well as the statute of limitations, which defendants have raised as an affirmative defense.

### 1. Prudence of allowing and holding investments in the Tellabs stock fund

■ There is no dispute that during the class period defendants were each fiduciaries of the Plan pursuant to ERISA. As fiduciaries, defendants owed a duty of prudence to the Plan and its participants. 29 U.S.C. § 1104(a)(1)(B). ERISA requires fiduciaries to exercise their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* So long as they do not have a conflict of interest, ERISA trustees are entitled to deferential judicial review. *Armstrong v. LaSalle Bank Nat'l Assoc.,* 446 F.3d 728, 732 (7th Cir.2006). Plaintiffs claim that defendants violated their duty of prudence by allowing the Plan to continue holding and investing in the Tellabs stock fund during the class period.

■ Fiduciaries must also act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent" with the other requirements of ERISA. 29 U.S.C § 1104(a)(1)(D). Ordinarily a plan's assets must be diversified so that it does not become overly concentrated in a single asset. *Id.* § 1104(a)(1)(C). That rule, however, does not apply to the Plan's ownership of Tellabs stock, because the Plan qualifies as an eligible individual account plan (EIAP). *Id.* § 1104(a)(2); *Pugh v. Tribune Co.,* 521 F.3d 686, 699 (7th Cir.2008). Taking these principles together, a fiduciary may permit a plan's assets to become concentrated in company stock if doing so comports with the documents governing the plan and does not otherwise violate ERISA. Thus if the Plan required Tellabs stock as an investment option, defendants were required to follow that directive unless doing so would violate ERISA.

After reviewing the Plan and the related trust, the Court concludes that the Plan documents required defendants to offer Tellabs stock as an investment option. The Tellabs stock fund was a "Fund" as defined by the Plan. Defendants had the power to set performance criteria for each "Fund," and to terminate "Funds." Based on those provisions, plaintiffs contend that the Tellabs stock fund could be terminated

as an investment option. Plaintiffs' interpretation, however, would improperly read other language out of the Plan. *See, e.g., Foskett v. Great Wolf Resorts, Inc.*, 518 F.3d 518, 522 (7th Cir.2008) (recognizing the general rule that written instruments are construed as a whole to give meaning to each of their provisions). The Plan specifically required that "[a] second Fund shall be established, maintained and invested in the common stock of Tellabs, Inc." JX 8 at TL–ERISA 6824–25. Similarly, the Plan's trust agreement provided that the Plan "shall be composed of assets of the Company Stock Investment Fund" as well as other funds established by the investment committee. JX 58 at TLERISA 158. These provisions contemplated that the Tellabs stock fund would be established and maintained by defendants. The requirement to maintain that fund would be rendered meaningless under plaintiffs' interpretation of the Plan.

Moreover, as a general principle of construction, when a written instrument contains specific and general provisions regarding the same subject, the specific provision controls. *See, e.g., Dexter Axle Co. v. Int'l Assoc. of Machinists & Aerospace Workers, Dist. 90, Lodge 1315*, 418 F.3d 762, 765–66 (7th Cir.2005). Though the Plan generally granted defendants the power to evaluate and terminate "Funds," it specifically stated that a Fund comprised of Tellabs stock was required to be maintained and offered to Plan participants.

Even when a plan requires an employer to offer its own stock as an investment option for employees, there are still situations where ERISA's duty of prudence requires the plan's fiduciaries to diversify an employee stock fund. *See, e.g., Pugh*, 521 F.3d at 700; *Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 410–11 (7th Cir.2006); *Steinman v. Hicks*, 352 F.3d 1101, 1106 (7th Cir.2003); *Nelson v. IPALCO Enters., Inc.*, 480 F.Supp.2d 1061, 1096–97 (S.D.Ind.2007), *aff'd on unrelated grounds sub nom. Nelson v. Hodowal*, 512 F.3d 347 (7th Cir.2008). Some courts, starting with the Third Circuit, have adopted a rule that fiduciaries are presumed to have acted prudently by holding company stock in an ERISA plan that required them to do so. *E.g., Moench v. Robertson*, 62 F.3d 553, 571–72 (3d Cir. 1995); *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 254–56 (5th Cir.2008); *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1098 (9th Cir.2004); *Kuper v. Iovenko*, 66 F.3d 1447, 1458–59 (6th Cir. 1995); *see also Nelson*, 480 F.Supp.2d at 1098 n. 14. The Seventh Circuit has neither adopted nor rejected this rule, though it has cited *Moench* favorably on related issues. *See, e.g., Summers*, 453 F.3d at 410; *Steinman*, 352 F.3d at 1106. Regardless of whether a presumption of prudence applies, defendants are entitled to judgment on this claim because plaintiffs have failed to establish by a preponderance of the evidence that defendants breached their duty of prudence. *Nelson*, 480 F.Supp.2d at 1099.

### a. Procedural prudence

Plaintiffs contend that defendants breached their fiduciary duty of prudence by failing to consider whether it was appropriate to continue maintaining the Tellabs stock fund as an investment option and whether to divest that fund at the start of the class period. As noted above, the investment committee met only once a year, and neither the investment nor the administrative committee expressly discussed whether the Tellabs stock fund should remain part of the Plan. Hewitt did not provide any analysis with respect to Tellabs stock, and the defendants never retained the services of an independent fiduciary. "[A] discretionary judgment cannot be upheld when discretion has not

been exercised." *Armstrong,* 446 F.3d at 733–34 (reversing summary judgment in favor of ERISA fiduciaries in the absence of evidence that fiduciaries considered how to balance plan participants' interests).

The lack of formal discussions about the Tellabs stock fund in committee meetings does not necessarily mean, however, that defendants failed to consider this issue. Birck, Notebaert, Ryan, Jackman, and Ragusa credibly testified that they did not require independent analysis of Tellabs' prospects based on their extensive knowledge of Tellabs by virtue of their roles as high level executives and employees.[2] They discussed Tellabs' business, stock price, and future prospects with each other frequently, albeit outside the context of investment and administrative committee meetings. *Nelson,* 480 F.Supp.2d at 1099–1100 (concluding that fiduciaries did not breach duty of prudence although they never formally considered divestiture of company stock or sought independent analysis). Though it would have been wise for defendants to conduct a more formal review of the Tellabs stock fund and to document that review, its absence does not mean they were imprudent in light of their intimate knowledge of Tellabs.

In *Nelson,* the defendants were ERISA fiduciaries who were also high-ranking executives of the company at issue. *Id.* The plaintiffs sued for alleged violations of the duty of prudence following a decline in their company stock assets after a merger with another company. *Id.* Even though the defendants in *Nelson* did not formally discuss the merger and its effect on the company stock fund at pension committee meetings, the court concluded that it could "reasonably infer from the evidence that the impending closing [of the merger] was *the* principal topic of discussion at [the company], including among senior execu-

tives...." *Id.* at 1100 (emphasis in original). Similarly, the Court can infer in this case that based on all of the evidence presented, Tellabs' difficulties and their effect on Tellabs' stock price and future prospects were the principal issues discussed among Birck, Notebaert, Ryan, Jackman, and other Tellabs employees on a near daily basis during the class period.

The testimony of plaintiffs' expert Hutcheson is unpersuasive. Though Starks' credibility is not free from blemishes (given the fact that she testified on behalf of Tellabs while she served as a fiduciary of an institutional investor that may have some interest in a class action claim against Tellabs in a related securities fraud case) and her analysis is not entirely relevant, the Court agrees with her assessment that Hutcheson elevated form over substance. Defendants were aware of their fiduciary duties and that the Tellabs stock fund was the Plan's riskiest investment, due to its nature as a single-security fund. They implicitly concluded, however, in light of their intimate knowledge of Tellabs' business, that there was no reason to discuss removing the Tellabs stock fund from the Plan. Under these circumstances, plaintiffs have not established that defendants failed to exercise their discretion or were procedurally imprudent.

### b. Substantive prudence

 Even had plaintiffs established that defendants failed to properly examine the Tellabs stock fund, defendants would still be entitled to judgment on the prudence claim because the evidence shows that a reasonably prudent individual in similar circumstances who undertook such an examination would not have sold the Plan's Tellabs stock or removed it as an investment option. The fact that the stock

---

**2.** ERISA expressly contemplates that a company's executives may serve as fiduciaries charged with responsibility over a plan's investments. *See* 29 U.S.C. § 1108(c)(3).

price dropped significantly during the class period is not, on its own, conclusive. *See Edgar v. Avaya, Inc.*, 503 F.3d 340, 348 (3d Cir.2007); *Wright*, 360 F.3d at 1099. "[T]he ultimate outcome of an investment is not proof of imprudence.... The fiduciary duty ... requires prudence, not prescience." *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir.1990) (internal quotations omitted). Nor is it enough to show that fiduciaries simply had some knowledge that the company faced difficulties: "[o]ne cannot say that whenever plan fiduciaries are aware of circumstances that may impair the value of the company stock, they have a fiduciary duty to depart from ESOP or EIAP plan provisions [requiring inclusion of company stock as part of the plan]." *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 256 (5th Cir.2008). Rather, it is necessary to examine what reasonably prudent fiduciaries would have done based on the information available at the time. 29 U.S.C. § 1104(a)(1)(B).

The parties disagree over what is required before a fiduciary of an ERISA plan that requires the plan to hold company stock can disregard the plan's terms and divest the company stock. Plaintiffs contend that although *Moench* set out an example of impending collapse, less is required. The Seventh Circuit has not specified a standard, though it has provided some examples of what circumstances might require a prudent fiduciary to divest company stock. *E.g., Steinman*, 352 F.3d at 1106. The Court, however, need not adopt or create a definite standard to resolve this case. Regardless of whether the standard is impending collapse or something short of that, plaintiffs have not proven that it was imprudent for the Plan to continue investing in Tellabs stock during the class period.

As discussed above, the telecommunications industry and Tellabs encountered serious problems starting in 2001 that continued through the class period. During the first quarter of 2001, defendants were aware that sales of the 5500 were not coming in as quickly as the five-year historical average. At the same time, however, recent trends had demonstrated more sales late in the quarter, and the various sales and forecasting teams believed that Tellabs would be able to achieve its forecast. Even after the forecast was publicly revised downward, defendants still expected, based on the data available to them, that Tellabs would meet the revised numbers. Defendants received multiple reports each week on these issues and were in constant communication with each other regarding Tellabs' business.

Even though Notebaert expected that Tellabs would recover in 2001, he began efforts to control the company's expenses. Doing so did not mean that Notebaert thought Tellabs could go bankrupt or suffer a prolonged downturn. Rather, he was taking prophylactic measures to protect the company. Similarly, the fact that Tellabs cut costs through additional layoffs in 2001 and 2002 does not demonstrate that Tellabs stock was no longer a prudent investment. Rather, Defendants were taking corrective action to meet the new realities of their place in the telecommunications field. At the same time, defendants' own internal research, as well as analysts in the market, indicated that Tellabs and its industry would rebound. During the class period, there was never any real threat that Tellabs would go bankrupt or cease to exist as plaintiffs contend. This is reflected by Tellabs' strong cash position, positive cash flow, and low amounts of debt.

Against this factual backdrop, plaintiffs have failed to establish that defendants breached their duty of prudence. A reasonable fiduciary in similar circumstances

would not have concluded that the Plan should have divested its Tellabs stock or ceased offering it to participants as an investment option. Courts have determined that ERISA fiduciaries did not breach their duty of prudence with respect to company stock in factual settings that were similar to or even more dire than the current case. In *Summers*, the Seventh Circuit concluded the plaintiff had not established that the defendant breached the fiduciary duty of prudence by failing to diversify the assets in an employee stock ownership plan even after the company's stock price had dropped over fifty percent and its CEO had sent a letter to all employees stating "that the company was 'in a struggle just to survive[,] ... hemorrhaging money,' " and at real risk of " 'perish[ing].' " *Summers*, 453 F.3d at 407–08; *see also Kirschbaum*, 526 F.3d at 255–56 (prudence did not require divesting company stock even after fiduciaries discovered that some employees had engaged in fraudulent business practices that grossly inflated the company's financials and, when disclosed, caused a forty percent drop in stock price); *Edgar*, 503 F.3d at 348–49 (allegations that defendants knew company faced reduction in demand for products, would suffer negative financial consequences of a recent acquisition, and experienced disruptions in sales were insufficient to state a claim for breach of duty of prudence); *Wright*, 360 F.3d at 1098–99 (holding fiduciaries did not act imprudently by holding stock where evidence showed the company "was far from the sort of deteriorating financial circumstances involved in *Moench* ").

The Court disagrees with Vollmar's testimony that Tellabs stock was no longer a prudent investment for the Plan as of February 19, 2001. Though Notebaert sent Birck a letter on that date raising concerns about Tellabs' business prospects in the short term, ample evidence was presented that defendants believed and had reason to believe, both on that date and subsequently, that Tellabs would recover. Vollmar did little to support his conclusion other than looking at Notebaert's letter in isolation, and he did not conduct any quantitative analysis of Tellabs' financial prospects based on the information available.[3] This further reflects that Vollmar's analysis looked at a snap shot on a given day without considering that retirement plans are typically long-term investments. Vollmar's review of other documents similar to the February 19 letter suffers from the same deficiencies. The Court agrees with defendants' characterization of Vollmar's methodology as little more than an "I know it when I see it" test. Defs.' Proposed Findings of Fact and Conclusions of Law at 192. His analysis was neither helpful nor persuasive in the Court's effort to analyze defendants' conduct and the prudence of investing in Tellabs stock.

■ In reaching its conclusion, the Court does not mean to suggest that defendants are not liable simply because they acted in good faith. "Good faith does not provide a defense to a claim of a breach of fiduciary duties; a pure heart and an empty head are not enough." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007) (internal quotation omitted). Defendants' heads were not empty, even though their predictions turned out to be wrong. They considered the information available to them at the time. Plaintiffs have not established that a prudent fiduciary, under those circumstances, was required to sell the Plan's Tellabs stock and halt further contributions to the Tellabs stock fund.

---

**3.** The absence of any quantitative analysis is surprising given that Vollmar, as a CPA and chartered financial analyst, certainly appears qualified to conduct such an analysis.

## 2. Alleged misrepresentations and omissions

 Plaintiffs' second claim is that defendants breached their fiduciary duty to honestly disclose material information. "Fiduciaries breach duties of loyalty and care [under ERISA] if they mislead plan participants.... Fiduciaries must also communicate material facts affecting the interests of beneficiaries." *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir.1993) (internal citation omitted); *see also Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 590 (7th Cir. 2000). A misrepresentation or omission is not actionable if it is not material. *See Nelson v. Hodowal*, 512 F.3d 347, 351 (7th Cir.2008) ("*Any* tidbit might cause such a reaction; the materiality requirement entitles fiduciaries to limit their disclosures and advice to those facts that concern real economic values.") (emphasis in original); *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 443 (3d Cir.1996) (noting materiality requirement).

 First, with respect to any alleged omissions, the Court rejects defendants' argument that they could not disclose certain information out of fear of violating securities laws. *See, e.g., In re WorldCom, Inc. ERISA Litig.*, 263 F.Supp.2d 745, 767 (S.D.N.Y.2003). Adopting that reasoning would essentially permit a fiduciary to violate his or her ERISA duties under the guise of complying with another statute when other options exist. For example, if disclosing information to plan participants would violate a statutory ban on selective disclosure, the fiduciary could inform both plan participants and the general public. *In re Ferro Corp. ERISA Litig.*, 422 F.Supp.2d 850, 862–63 (N.D.Ohio 2006). Alternatively, an ERISA fiduciary facing this perceived conflict could retain an independent fiduciary to deal with issues concerning company stock.

 Regardless, defendants are entitled to judgment on their duty to disclose claim because plaintiffs have failed to prove by a preponderance of the evidence that defendants made material misrepresentations or failed to disclose material information to which plaintiffs were entitled. This does not mean that defendants carry the day, as they seem to suggest, because they disclosed to plaintiffs that the Tellabs stock fund was the riskiest investment offered as part of the Plan. Rather, the important question is whether defendants misrepresented or withheld material information that plaintiffs needed to make an informed decision about their investment selections.

As detailed above in the Court's findings of fact, defendants did not make any material misrepresentations to plaintiffs. Defendants certainly made a number of predictions about Tellabs and the telecommunications industry that turned out to be wrong. But the evidence does not demonstrate that defendants misrepresented either the facts or their expectations when they made those statements. Rather, defendants' statements concerning Tellabs' prospects, future sales, the 5500, the 6500, and SALIX (to name a few) were accurate based on the information that was available to defendants, including their internal forecasting, discussions with Tellabs sales teams, information received from customers, and analysis provided by industry experts. In hindsight, it is arguably easy to connect the dots and see the direction in which Tellabs was headed. But given the information available to defendants at the time, the statements they made did not distort the facts on either an objective or subjective level.

At times during the class period, defendants made general statements about the possibility of Tellabs recovering. At the same time, however, defendants balanced

their message by acknowledging the serious problems facing the company, citing specific problems such as slow sales and reduced customer spending, and announcing six rounds of layoffs and other cost cutting measures during the class period. For example, on June 20, 2001, Notebaert informed employees that based on the company's product mix, including the 6500 and the TITAN 6100, he was "confident" about Tellabs' "long term prospects." JX 209.23 at 5364. Notebaert also stated, however, that "[o]ur customers continue to be very cautious about capital spending, and this affects both our competitors and Tellabs.... In short, the industry has gone on a diet." *Id.* at 5363–64. The same announcement contained multiple warnings that Tellabs would do what it needed to cut costs and align expenses with production. This is just one example of how defendants' statements, taken individually or together, were not misleading, especially when read in the context of the entire statements.

Nor did defendants withhold material information to which plaintiffs were entitled. As detailed above, Tellabs provided its employees with a constant stream of information about the company through the intranet site, the weekly newsletter, and town hall meetings. Employees were also provided access to statements made by defendants to the general public. Thus plaintiffs regularly received information on Tellabs' performance, stock performance, and future expectations. *See Smith v. Delta Air Lines, Inc.*, 422 F.Supp.2d 1310, 1333 (N.D.Ga.2006) (no breach of duty to disclose information where employees received numerous press releases and articles detailing employer's financial condition).

Plaintiffs have cited no authority holding that participants in an ERISA plan are entitled to receive daily or weekly disclosures with the most up-to-date information

regarding the company's performance or the performance of its specific products. Yet that is essentially what they contend they should have received. One of the cases cited by plaintiffs emphasizes the duty of fiduciaries to disclose information about the financial condition underpinning investment options but at the same time acknowledges fiduciaries do not have to disclose "everything" they know. *See In re Unisys Savings Plan Litig.*, 74 F.3d at 443. The evidence shows that starting in 2001 and continuing through the class period, Tellabs was operating in a changing environment. Plaintiffs were promptly informed of major developments once they had occurred and defendants understood them. Defendants were not obligated to provide continual updates of potentially negative information before they could analyze it and come to a conclusion about its import for the company's future.

### 3. Duty of loyalty

▇ Plaintiffs' third claim is that defendants breached their fiduciary duty of loyalty. Defendants, as ERISA fiduciaries, owed a duty of loyalty to the Plan and its participants. 29 U.S.C. § 1104(a)(1)(A). The basis for plaintiffs' contention that defendants breached their duty of loyalty is far from clear. It appears to stem from two facts. One is the fact that the individual defendants owned Tellabs stock, either in the Plan or as a separate investment. Plaintiffs do not explain, however, how this fact caused defendants to breach their duty of loyalty. The second is plaintiffs' allegation that "[c]ertain fiduciaries, including Birck and Notebaert, possessed the relevant knowledge to prevent large and disproportional losses ... during the Class Period, but acted disloyally toward participants by actively concealing that knowledge." Pls.' Am. Proposed Findings of Fact and Conclusions of Law at 97–98. As detailed above, defendants did not pos-

sess such knowledge. Nor did they withhold material information from plaintiffs in this regard.

The facts and language in the cases cited by plaintiffs regarding the duty of loyalty demonstrate that they are inapposite. *See In re Syncor ERISA Litig.*, 516 F.3d 1095, 1102 (9th Cir.2008) (duty of loyalty could be violated where company's stock "was artificially inflated ... by an illegal scheme about which the fiduciaries knew or should have known, and then suddenly declined when the scheme was exposed"); *Moench*, 62 F.3d at 572 (noting "the potential for disloyal self-dealing ... when insiders act for a closely held corporation ESOP"); *Leigh v. Engle*, 727 F.2d 113, 118–19, 125–26 (7th Cir.1984) (fiduciaries invested trust assets for use in a corporate control contest against target companies); *Donovan v. Bierwirth*, 680 F.2d 263, 265–70 (2d Cir.1982) (pension assets used in corporate takeover bid); *Canale v. Yegen*, 782 F.Supp. 963, 969 (D.N.J.1992) (duty of loyalty implicated by "fiduciaries with knowledge of fraudulent actions undertaken by an entity"). Plaintiffs have not presented any evidence, much less proved, that defendants knew or should have know of any sort of illegal scheme at Tellabs, used the Tellabs stock fund to wage a battle for corporate control, engaged in fraudulent activity, or knew of fraudulent activity.

Plaintiffs point out (again) that defendants did not hire an independent fiduciary to review the Tellabs stock fund. They offer no additional authority, however, reflecting that defendants were obligated to do so under ERISA. This argument fails for the same reason it did with respect to the alleged breach of the duty of prudence. For these reasons, plaintiffs failed to prove by a preponderance of the evidence that defendants breached their duty of loyalty.

### 4. Failure to monitor

Last, plaintiffs contend that defendants breached their duty to monitor other fiduciaries of the Plan. Individuals who appoint ERISA fiduciaries have a duty to monitor those fiduciaries' actions and to provide them with the information necessary to carry out their responsibilities. *Leigh*, 727 F.2d at 135; *Howell v. Motorola, Inc.*, 337 F.Supp.2d 1079, 1099 (N.D.Ill.2004). Plaintiffs contend that Tellabs and its directors failed to monitor the Plan's fiduciaries and that this was a separate breach of fiduciary duty.

Plaintiffs' failure to monitor claim is duplicative of the other breaches of fiduciary duty that plaintiffs alleged but, as detailed above, failed to prove at trial. Indeed, in the 107 pages of proposed findings and conclusions plaintiffs submitted, they spend only one page on their failure to monitor claim. For the same reasons discussed earlier, defendants are entitled to judgment on the failure to monitor claim. Plaintiffs have not proved that any of the defendants failed to monitor appointed fiduciaries. Moreover, because plaintiffs failed to prove their other breach of fiduciary claims, it would make no sense to hold defendants liable for failure to monitor, as no injury resulted from any such failure. In other words, those whom defendants allegedly did not monitor did not breach their duties or cause any injury to plaintiffs.

### 5. Statute of limitations

Even had plaintiffs established their claims, defendants would still be entitled to judgment, because this lawsuit was not filed within the applicable statute of limitations. ERISA provides:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation ... after the earlier of ...

(2) three years after the earliest date on which the plaintiff had actual knowledge of the beach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of the such breach or violation.

29 U.S.C. § 1113. Thus the statute of limitations is three years, expect in cases of fraud or concealment. *Id.*; *see also Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1095 (7th Cir.1992). Plaintiffs filed this case on April 5, 2006.

■■■ Plaintiffs contend that the six-year statute of limitations applies in this case because of defendants' misrepresentations and failure to disclose material facts. The Court denied defendants' motion for summary judgment on this issue because disputed issues of fact existed regarding whether defendants acted fraudulently or concealed information. *See Brieger v. Tellabs, Inc.*, No. 06 C 1882, 2009 WL 720975 (N.D.Ill. Mar. 16, 2009). As noted above, however, the Court has now concluded, after hearing the evidence, that plaintiffs failed to prove that defendants made any fraudulent misrepresentations or concealed from plaintiffs material facts about the company. Accordingly, the three-year limitation period applies. *See* 29 U.S.C. § 1113.

The Seventh Circuit has cautioned against substituting constructive knowledge for actual knowledge to determine when the statute of limitations began to run in a particular case.

To charge [plaintiff] with actual knowledge of an ERISA violation, it is not enough that he had notice that something was awry; he must have had specific knowledge of the actual breach of duty upon which he sues. . . . At the same time, the relevant knowledge for triggering the statute of limitations is knowledge of the *facts* or *transaction*

that constituted the alleged violation. Consequently, it is not necessary for a potential plaintiff to have knowledge of every last detail of a transaction, or knowledge of its illegality. . . . [A] plaintiff must know of the essential facts of the transaction or conduct constituting the violation. . . .

We know that somewhere between "every last detail" and "something was awry" lies requisite knowledge of an ERISA violation. The proper characterization will usually turn [on the facts of each case]. Beyond such generalizations, however, we can only say that judges, faced with particular contexts and relying on their "situation sense," must make the determination.

*Martin*, 966 F.2d at 1086 (internal citations and quotations omitted) (emphasis in original). Defendants imply that plaintiffs had knowledge of their breach of fiduciary duty claims as soon as Tellabs stock began to drop. That fact alone was insufficient to trigger notice. In contrast, plaintiffs contend that the statute of limitations did not begin to run until plaintiffs knew of the process by which investments, including Tellabs stock, were selected for the Plan. The problem with plaintiffs' contention is that it effectively would eliminate the statute of limitations, as plaintiffs learned of the information they contend they needed to know (e.g., how the investment and administrative committees acted) during discovery after they filed this case.

■■■ The Court concludes that the statute of limitations began to run no later than June 19, 2001. By that date, plaintiffs had observed Tellabs stock price drop by $41.99, representing approximately a sixty-six percent drop since December 11, 2000. During that time frame, defendants made numerous statements to plan participants and the general public about the serious problems facing both Tellabs and

the telecommunications industry. All the while, plaintiffs knew that Tellabs stock remained one of the available investment options in the Plan and that Tellabs continued to make certain contributions to their accounts that had to be invested in Tellabs stock. Plaintiffs did not yet know every detail and fact that comprised their claims, but they knew that the stock price had plummeted and that defendants had not removed it from the Plan despite the steady stream of negative news that plaintiffs were then receiving about Tellabs. This was more than notice that something was merely awry. Under these circumstances, plaintiffs had sufficient knowledge and information to begin the running of the limitation period no later than June 19, 2001. Thus the statute of limitations ran on June 19, 2004, over twenty-one months before this case was filed.

### Conclusion

For the foregoing reasons, the Court directs the Clerk to enter judgment in favor of defendants.